[No. 8200]

# THE PEOPLE EX REL. COLORADO TAX COMMISSION ET AL. V. PITCHER.

1. CONSTITUTIONAL LAW—*Power of the Legislature*—The power of the legislature to prescribe the procedure for raising the public revenues is plenary, except as limited by the federal and state constitutions. No act will be declared invalid, unless its repugnance to the fundamental law is clear beyond a reasonable doubt.

The general assembly may not destroy the office of county assessor, but may prescribe that the work of the assessor may be corrected, supplemented, or revised, e. g. by a central body, with power to bring the taxable property in each county to its full cash value, for the purpose of taxation.

They may not relieve either the state or county board of equalization of the duties which the constitution imposes upon these bodies respectively, or delegate those duties to others.

A valuation, however low, which is equal and uniform, is a just valuation, and meets the constitutional requirement; but under sec. 2 of art. X of the constitution the general assembly may provide a plan by which all property shall be assessed at its full value.

2. STATE BOARD OF EQUALIZATION—*Powers*—The primary valuations of property in the several counties ascertained and reported by the agencies appointed by law for that purpose, must, by the state board of equalization, be considered and dealt with as entireties.

After the state tax commission has completed its labors, the state board of equalization meets at the time and place designated by the statute, for the purpose of equalizing the valuation of property among the several counties. In this matter it is supreme, save that it may not change the aggregate of the total valuation of all the counties. It may decrease the valuation in one or more counties, but only by a corresponding increase in others, merely correcting inequalities.

In order to authorize an increase in the valuations made by local authority, actual notice to the individual tax-payer is not required. The statute fixing the time and place of the meeting of the board is, of itself, notice.

3. STATE TAX COMMISSION—*Constitutionality*—Nothing in the constitution prohibits the legislature, either directly or by necessary implication, from investing such a body with the general supervision of the assessment and collection of taxes, with power to revise the action of county assessors and other officials.

4. ——*Powers*—The statute (Laws 1911 c. 216) as amended by the act of 1913 (Laws 1913 c. 125) invests the state tax commission with

authority to cause all property to be assessed at its actual and full cash value, and to that end confers upon that body general supervision over the administration and enforcement of the laws for the assessment, levy and collection of taxes; and like supervision over all county offices and boards.

Two methods are prescribed by which the board may act; one by subdivision 6 of sec. 13 of the act of 1911 and the other by sec. 31.

By the first provision the board is authorized to reappraise classes of property, increase or decrease the valuations made by the assessors, and require omitted properties to be placed upon the rolls.

By the latter provision the commission may deal with the aggregate values in the several counties, as fixed by the assessors, or equalized by the county boards of equalization.

The power conferred by the first provision can be exercised only prior to the action of the county boards of equalization. As to the latter, it seems immaterial whether the tax commission act before or after the county board.

The wisdom, policy, and necessity of the statute vindicated.

5. ——*Notice to Taxpayer*—The notice to the taxpayer required by sub-division 7 of sec. 13 is to be given only when the tax commission is proceeding under subdivision 6; the statutory provision in question has no application when a horizontal increase of the properties in the county is proposed, or an amount to be added.

To such increase it is not required that the individual tax payer shall have notice. Sections 9, 15, 30, 31, of the act, sufficiently prescribe the time and place of the meeting of the board for the purpose of the increase, and this is a sufficient notice. *Gale v. Statler*, 47 Colo. 72, distinguished.

Otherwise, when it is proposed to increase the valuation of the property of an individual taxpayer. In such case he must have actual notice.

6. STATUTES—*Legislative Construction*—The amendment to the constitution proposed by the act of June 5, 1911, (Laws 1911 c. 110) and rejected by the people, is not to be interpreted as a legislative condemnation of their own work in the statute in question.

7. EVIDENCE—*Official Admissions as to the Law*—The functions of government invested by law in a particular board are not to be interpreted, or their interpretation affected, by the theory upon which the question is presented by the officers of the law.

## Original Proceeding in Mandamus.

Hon. FRED FARRAR, Attorney General, Mr. NORTON MONTGOMERY, Assistant Attorney General, and Mr.

FRANK C. WEST, Assistant Attorney General, for petitioner.

Mr. I. N. STEVENS, Mr. GEO. Q. RICHMOND, Messrs. BENEDICT & PHELPS, for respondent.

Messrs. ROGERS ELLIS & JOHNSON, Mr. PIERPONT FULLER, *Amici Curiae*.

Mr. JUSTICE WHITE delivered the opinion of the court:

Upon application of the People, *ex rel.* the State Board of Equalization and the Colorado Tax Commission, we assumed original jurisdiction of the matters here involved, and issued the alternative writ of *mandamus* directed to respondent Pitcher, as commissioner of finance and *ex officio* assessor of the city and county of Denver, commanding him to make, as directed and ordered by the Colorado tax commission and also by the state board of equalization, a certain increase in the valuation of the assessment of the real and personal property of the city and county of Denver as returned in his abstract of assessment for the year 1913, or to show cause within a day named why he had not done so.

The pleadings disclose that the county assessors within and for each county of the state, filed with the Colorado tax commission, as required by law, abstracts of assessment of property within their respective counties for the year 1913; that the tax commission thereupon determined that in fifty-eight of the sixty-three counties of the state the valuations fixed by the several assessors, and set forth in such abstracts of assessment, were below the full and true cash value of the property so assessed. It thereupon examined all such abstracts of assessment, and secured information for the purpose of ascertaining the changes and increase necessary to cause such prop-

erty to appear on the assessment rolls at its full cash value, made and entered findings in that respect, and ordered and directed the several county assessors, including the respondent, to make the required change in their respective counties. In the city and county of Denver the increase made and ordered upon the valuation as returned by the assessor, was 40 per cent, or, approximately, $102,000,000, and in the entire state approximately $187,000,000 over and above the valuation returned by the several county assessors.

The tax commission thereupon reported its action in the premises to the state board of equalization, in session for the purpose of equalizing assessments among the several counties of the state. That board made no changes, but adopted the findings of the tax commission, fixed the levy of taxes for state purposes, and certified its action in the premises to the tax commission and the several assessors of the state. Thereafter, the tax commission, by an order made and entered, recited the action of the state board of equalization in the premises and the levy fixed for state purposes, and again ordered and directed the assessors of the several counties, including the respondent, to make the specified increase by adding the amount which the former had found necessary in each county to make the assessment of the property therein of full cash value. The state auditor likewise certified to the clerk and recorder of the city and county of Denver that the state board of equalization, convened and in session for that purpose, had, on the 20th day of October, 1913, fixed the rate of tax at 1.3 mills to be levied and collected within the various counties of the state, for state purposes, for that year, and, among other things, had, by resolution duly adopted, increased the valuation of the real and personal property of the city and county, as hereinbefore set forth, as having been made and ordered by the tax commission.

The return of the respondent to the alternative writ challenges the sufficiency of the facts to state a cause of action, alleges that the assessment made and certified by him is the full and true cash value of the property assessed, except that since transmitting his abstract to the tax commission he has increased the valuation of the assessable property within the city and county of Denver a little more than $8,000,000; that the tax commission and the board of equalization each exceeded its jurisdiction in the premises; that the valuation of the property as determined by the commission was greatly in excess of its true value, and that the statutory provisions under which the tax commission and the board of equalization pretended to act are unconstitutional.

The record discloses that in making, ordering and directing the increase in the valuation of the assessable property, over that as returned by the assessor, the state board of equalization and the Colorado tax commission duplicated each others acts. It, therefore, follows that if the acts performed constituting the increase, fall within the powers conferred upon either body, the increase must be sustained; otherwise declared non-effective. In determining this question it is also essential to consider the powers and duties of county assessors, and county boards of equalization; and in doing this a construction must be placed upon the acts of the general assembly, if possible, so as to render them consistent with each other and in harmony with the fundamental law. Moreover, as the power of the legislature to enact laws and prescribe the procedure for raising revenue to support the government, is plenary, except as limited by the inhibitions of the federal and state constitutions, no act of that department will be declared invalid unless its repugnance to the fundamental law is clear and beyond reasonable doubt. The judicial department is not invested with legislative power and can not arrest acts of legislation

within constitutional bounds, even though, in the judgment of the court, such acts be unwise.—*Newman v. People*, 23 Colo. 300, 306, 47 Pac. 278; *Wadsworth v. U. P. R. R. Co.*, 18 Colo. 600, 612, 33 Pac. 515, 23 L. R. A. 812, 36 Am. St. Rep. 309; Cooley's Const. Lim. (6th Ed.), c. 7.

In *People ex rel. v. Henderson*, 12 Colo. 369, 371, 21 Pac. 144, 145, Mr. Justice Helm well expressed this rule in the following language:

"We also bear in mind the familiar principles that, except as controlled by constitutional limitation, the authority of a state legislature in enacting laws is plenary, and that, unless there be a clear and positive repugnancy between a statute and a constitution, the statute must be upheld."

And in *Ames v. People*, 26 Colo. 83, 109, 56 Pac. 656, 665, after quoting with approval this language of Mr. Justice Helm, we said:

"In numerous other cases this rule of construction has been approved by this court, but it is not necessary to cite them here, as it has become firmly established in this jurisdiction."

See also *State ex rel. v. Daniels*, 143 Wis. 649, 653, 128 N. W. 565, 566, where the rule is aptly expressed in the following language:

"It is elementary law that an act of the legislature will not be declared unconstitutional unless its repugnance to the constitution is clear and beyond reasonable doubt.    *    *    *    Equally well settled and as oft reiterated is the other rule that 'the legislature has plenary power over the whole subject of taxation within constitutional limitations.' "

Keeping in mind these elementary rules of construction, and directing our attention to the state constitu-

tion, we find that it commands the general assembly to provide by law for an annual tax sufficient, with other resources, to defray the estimated expenses of the state government for each fiscal year. It declares that all taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and shall be levied under a plan which shall secure a just valuation for the purposes of taxation. It exempts some, and prohibits the exemption of other property, from taxation. It inhibits the general assembly from imposing taxes for the purposes of any county, city or other municipal corporation, but authorizes it to invest the corporate authorities thereof with the power to assess and collect such taxes, and limits the rate of taxation on property for state purposes. Const., art. X, §§ 1 to 11 inclusive. To attain this end it creates certain governmental agencies, and under the general power of legislation, inherent in the general assembly as well as by express provision of the constitution, authorizes the creation of others. A county assessor is required to be elected in each county every two years. Const., art. XIV, § 8. A state board of equalization is constituted, and, in each county, a county board of equalization is provided for. Of these agencies, however, the state and county boards of equalization alone are expressly invested with constitutional duties, and, even they, may be required to perform other duties by legislative enactment. Const., art X, § 15.

The constitutional duty imposed upon the state board of equalization is to adjust and equalize the property values *among the several counties of the state*, and that upon the several county boards, to adjust and equalize such values *within* their respective counties. These duties having been imposed upon these agencies by the constitution, the general assembly is powerless to take them away, or confer them upon another. In *People ex rel. v. Lothrop*, 3 Colo. 428, it was held that the constitutional

section creating the state board of equalization, and prescribing certain duties for it to perform, does not give it power to raise the aggregate values previously ascertained by the county officers; and that the statutes then in force did not purpose to confer that power. *Ames v. People,* 26 Colo. 83, 96, 56 Pac. 656. It was further held therein that the term "valuation" as found in the constitutional section "imports values already estimated and fixed, and must be referred for the measure of its force and meaning to the mode prescribed by law for estimating and fixing valuations. The aggregate material with which the board can deal is thus limited; they may adjust and equalize valuations among the several counties, but they cannot add to its volume." So it follows, as held therein and also in *People v. Ames,* 27 Colo. 126, 131, 60 Pac. 346, that the state board, in equalizing and adjusting values, must deal with the respective county valuations as entireties. Under this rule it necessarily follows that the aggregate material with which the several county boards of equalization can deal is also limited and confined, when exercising the constitutional powers imposed, to the values already ascertained and fixed by the instrumentalities provided and empowered by the legislature to primarily ascertain and fix such values. By this means is effectuated the constitutional requirement that all taxes be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and be levied under a plan which shall secure a just valuation for the purposes of taxation. But there is no constitutional requirement that taxes be levied under a plan which shall secure a full valuation, and, therefore, a valuation, however low, which is equal and uniform, is a just valuation and meets the constitutional requirement. However, as the taxing power is vital to the functions of government, and the duty is constitutionally imposed upon the general assembly to provide by law for a state

tax sufficient, with other resources, to defray the esti-
mated expenses of the state government for each fiscal
year, and the rate of taxation on property for state pur-
poses is limited by the constitution to not exceed four
mills on the dollar of valuation, it may become of impera-
tive necessity to the very existence of the state govern-
ment and its institutions that property be assessed ac-
cording to its full cash value, and, unless there be a con-
stitutional inhibition, it lies within the power of the gen-
eral assembly to provide the plan necessary in its opin-
ion to effectuate that result.

In *People ex rel. v. Lothrop, supra,* it was held that
the statutes then in force did not purport to confer upon
the state board of equalization the power to raise the ag-
gregate values of property previously ascertained by the
county officers, and that if such power was conferred by
statute it would constitute that body a board of assessors
with power to fix and determine values as well as to ad-
just and equalize valuations.  At the time of that deci-
sion the statutes provided that all property, both real
and personal, within the state, not expressly exempted by
law, should be subject to taxation; that all taxable prop-
erty should be listed and valued each year and be as-
sessed at its full cash value; and provided a complete
plan whereby county assessors should list, value and as-
sess such property at such value.  Moreover, it required
each assessor to take an oath, and attach the same to his
assessment rolls, to the effect that he had made diligent
inquiry and examination to ascertain all the property
within his county subject to taxation; that he had as-
sessed it equally and uniformly, according to his best
judgment and information and belief, at its full cash
value; that he had faithfully complied with all duties im-
posed on the assessor by the revenue laws; that he had
not imposed any unjust assessment through malice, nor
allowed any one to escape a just and equal assessment

through favor. § 37, G. L., p. 754. These statutes constituted a complete scheme whereby the county assessors primarily made the assessment in the respective counties. Nevertheless, the legislature, evidently recognizing the constitutional limitations of the state and several county boards of equalization, wisely provided (§ 38, G. L., p. 754), that the latter bodies, in their respective counties, should correct and complete the assessment rolls, and, to that end, might supply omissions therein, and in equalizing the same, might increase, diminish, or otherwise alter and correct any assessment or valuation. In fact, as said in *People ex rel. v. Lothrop, supra,* the statute "constitutes them a *quasi* court to hear any and all complaints of the tax payer touching the valuation or listing of his property, with full power to adjust and correct the assessment roll as in their judgment they may deem proper and right, thus adding statutory duties to their constitutional duty 'to adjust and equalize.' "

Clearly, if as said on page 462 of that opinion, if the power to raise the aggregate values of property previously ascertained by the county officers was conferred by statute upon the state board of equalization, it would constitute that body a board of assessors with power to fix and determine values as well as to adjust and equalize valuations, then by § 38, G. L., p. 754, *supra,* when similar power was conferred upon county boards of equalization, they were thereby constituted boards of assessors within their respective counties. But, it is said that as a county assessor is a constitutional officer, though his duties are left unprescribed in that instrument, the general assembly is impliedly inhibited from authorizing any other officer to perform any of the duties or functions of assessment. Some courts have held that where the constitution designates an officer to be elected for a definite period without defining his duties or making specific provision therefor, and such office was known at common law, that thereby

such officer acquires a right, of which the legislature may not deprive him, to the exercise of the powers which have immemorially attached to the office.  However, the rule is by no means universal, and as far as we have been able to ascertain has been confined exclusively to well known common law officers, such as constable, coroner and sheriff.  Moreover, the rule, even as to such officers, does not seem to be logically supported.  In *State v. Dews*, determined by the superior court of Georgia, Charlton's Reports, p. 397, this question is considered at length.  The constitution of that state established the tenure of the office of sheriff, but imposed no other limitations upon the power of the legislature in relation to it, and it was held that by the silence of the constitution as to the duties pertaining to that office, it submits them "to the direction and control of that department of the government, which is invested with the power of making all laws which are not repugnant to" the constitution.  Further on in the opinion, the court said:

"But it is said, that the word 'sheriff,' is known to, and derived from the laws of England, and that by its adoption into our constitution, the nature and character, the powers, duties and rights of that office, as it existed under those laws, became fixed and established, by the fundamental law of the state, beyond the reach of legislative alteration, and that as by the common law, and the statutes 14 Edward III, c. 10, and 19 Henry VII, c. 10, the sheriff has the custody and keeping of the jail, and of the prisoners therein, that custody is by the constitution, embraced in the office of sheriff, and cannot be separated from it by legislative act.  If the premises assumed be, that the term 'sheriff' has been introduced into our constitution, according to its strict etymological sense, and as importing what it originally signified at common law, 'the keeper of the county,' with the authorities and dignities attached to the station, as the asso-

ciate of the king, the chief executive and military officer
of the county, invested also with high judicial powers,
whose office was purely honorary, and whose duties were
gratuitously discharged, it must be obvious that they are
incorrect, if in fact, they be not repugnant to the genius
of our institutions: while also, it must be equally appar-
ent, that by parity of reason, justices of the peace will be
protected, by constitutional safeguard, in the same ten-
ure, jurisdiction, powers and incidents, which belong to
those officers, in the country from which the constitution
has derived their designation. And the reason why the
corollary deduced from these premises is untrue, will fur-
nish an answer to the argument that has been built upon
them. It is, that they are officers created by law, whose
duties, powers, and responsibilities, are, and always have
been, regulated and controlled by law.   *   *   *   The
administration of justice, the pursuit of rights, and the
redress of wrongs; all laws which are administered
through judicial tribunals, all which relate to property,
to contracts, or persons; and these form the great mass
of the laws of every civilized community; the whole crim-
inal jurisprudence of the country, and every thing con-
nected with the enforcement of civil rights, require the
agency of the office of sheriff in England, or of an officer
of like nature and character, in every country where laws
and courts of judicature are known—and are, therefore,
immediately connected with his powers and duties. If
then, the powers and duties of the sheriff, as they exist
in England, are surrounded by the impregnable safe-
guard of the constitution, the laws of that country, al-
most in their totality, have been inflexibly fixed upon us;
they cannot be changed, since any change in them must
affect the sheriff in his powers or duties, his rights or
responsibilities, and make them different from what they
were in England, at the period of the establishment of
our constitution; and the framers of it, when ordaining a

government, in which they embodied the representative principle, in order that it might reflect the sentiments of the community, and with the distinct design, that the political society, which they are organizing, should advance with the advancement of the age, and accommodate itself to the improvements of society, have, with the iron hand of an imbruted despotism, stamped inflexible immutability upon our institutions; have bound us to the notions of our ancestors, no matter how exploded by the sentiments of society, or inconsistent with the interests; and not merely limited, but abolished the power of the legislature, in the very effort to organize it.   The proposition is too monstrous to be for a moment entertained.

"If it be true; the contemporaries of the constitution and those who, themselves, had an agency in framing it, have betrayed a lamentable ignorance, or been guilty of a wanton disregard of its provisions, by divesting the sheriff of the high judicial and executive powers which belonged to him in England and degrading him to the performance of unmixed ministerial services; by transferring from him the authority of presiding at elections and imposing on him the duty of attending them as a mere police officer, subject to the orders of others who preside; by depriving him of the important privilege of selecting jurors; by admitting constables, not of his nomination, to participate with him in the service of writs; by all the regulations in relation to sheriff's sales, and by the inforcing upon him of the duties of humanity towards prisoners whom the common law allowed 'in the name of God' to starve, if they could not support themselves; by requiring from him a bond, as a prerequisite to the discharge of his duties, and by numberless other interferences with his powers and privileges; nay, by the judiciary act itself, passed almost simultaneously with the constitution, and whose provisions the defendant invokes in support of his claims;—and not only by the acts which

have direct reference to his office, but also by all those which regulate courts and their proceedings.''

However, it is said that the framers of the constitution, when they employed the term ''assessor,'' necessarily had in mind the officer, whom it designated, in the light in which he was known to the inhabitants of the territory. In this view we concur, but it does not follow therefrom that the duties pertaining to the office may not be changed and modified in some respects. The territorial laws recognized the assessor, from the beginning, as an agency in raising public revenue, whose duty was prescribed by legislative enactment, frequently changed, and always subject to legislative control. The employment of the term in the constitution, therefore, so far from relieving his duties ʻfrom the control of the legislature, imports their subjection to the legislative will in the formation and adoption of regulations that will secure a just valuation of property for the purposes of taxation. Though the office can not be destroyed by the legislature, that agent may, nevertheless, not being restricted in this respect by the constitution, direct and provide that the work of such office may be corrected, supplemented or reviewed. While *Savings and Loan Society v. Austin,* 46 Calif. 415, was overruled in *Houghton v. Austin,* 47 Calif. 646, as pointed out in *Ames v. The People,* 26 Colo. 83, 92, 56 Pac. 656, certain language found in the overruled opinion is so pertinent to the question now being considered that we are constrained to adopt it. It is there said, on pages 474, 475 and 476:

''The argument for the plaintiffs is, that at the time of the adoption of the constitution, the term 'assessor' had a definite and well understood meaning, importing that he is an officer appointed or elected to ascertain and determine the value of property for the purposes of taxation; and that in requiring such an officer to be elected in

each 'district, county, or town in which the property taxed for state, county, or town purposes is situated,' the interference is necessarily implied, not only that he is to make the valuation, but that, when made, his determination as to the value is final; and that the valuation cannot be changed, altered, or in any respect modified, unless possibly by some superior board or officer, to be elected for that purpose by the electors of that district, county, or town. In support of this view, we are referred to the fact that this provision is peculiar to our constitution; and, it is claimed, was inserted *ex industria* in deference to the wishes of the native Californians, who were then the proprietors of large landed estates, and were apprehensive that unless the valuation for taxing purposes should be made by local assessors, to be elected by the people of the district, the burdens of taxation might be imposed chiefly on their lands and herds, to the exclusion of other property.

"Whatever weight may be due to this argument, it can hardly be deemed of such conclusive force as to preclude an examination of other provisions of the constitution in order to determine whether the construction now contended for would not or might not be subversive of one of its fundamental principles. As already stated, the governing rule ordained by the constitution—the central idea which pervades that instrument in respect to taxation—is that it shall be equal and uniform, and that property shall be taxed in proportion to its value.

"As one of the necessary steps towards ascertaining its value, local assessors must be elected, who shall make the primary valuation. But there is nothing in the instrument to indicate that this valuation was intended to be final. On the contrary, it is expressly provided that the valuation is to be ascertained *'as directed by law'*— which is an explicit recognition of the power of the legis-

lature to provide appropriate methods for ascertaining the value, subject only to the limitation that the primary valuation shall be made by local assessors to be elected by the people of the district. It may be further observed that, when the constitution was adopted, the term 'assessor' was not understood as defining an officer whose valuations were to be necessarily final. On the contrary, from the earliest period in our American jurisprudence, assessors had been employed in almost every state for the purpose of making the primary valuation of property for taxation, and in none of them, so far as we are advised, was this valuation final, but was subject to correction and alteration by some supervisory board or officer. In employing the term 'assessor' the framers of the constitution must be understood to have used it in this its popular sense.''

In *Ames v. The People, supra,* these California cases were reviewed and *Houghton v. Austin* was held inapplicable as an authority under our constitutional provisions. Moreover, while the doctrine of *Savings and Loan Society v. Austin* was not directly approved, it was held that in this state ''the sole power of fixing values is not vested in the assessors by the constitution.'' While we there declined to say how far the general assembly might go in taking from county assessors the power to assess property for taxation, we did hold, substantially, that construing § 8 of art. XIV, creating the office of county assessor, in connection with § 3 of art. X of the constitution, which enjoins upon the general assembly the duty of providing by general law such regulations as shall secure a just valuation for taxation of all property, and bearing in mind that § 7 of the same article expressly permits the general assembly to vest in corporate and municipal authorities power to assess and collect taxes for all their purposes, the general assembly was not inhibited from enacting laws authorizing the assessment of certain

classes of property by some other tribunal or board, if, in its wisdom, it determines that thereby a just valuation of such property may best be secured, and if the act on its face is not palpably ineffectual to accomplish that object. The same rule that the sole power of fixing values is not lodged by the constitution in county assessors is also recognized in *People ex rel. v. Lothrop, supra*. As the statutes then existed it was pointed out that the only exception to the power of the county assessor and the county boards of equalization in respect to assessment, was the express statutory provision for the assessment of railroad property by the state board of equalization. And it is said: "For this, in the opinion of the legislature, there was, doubtless, an obvious necessity and authority." So here, we decline to hold how far the general assembly may go in that respect. Nevertheless, in view of the constitutional provisions hereinbefore mentioned and to which reference will again be made, we are certain the legislature may adopt a plan whereby the work of assessors may be corrected, supplemented, added to or changed. Thereby that which the assessors were previously authorized to do by law need not be taken away, but those agencies may still be left free to perform those functions. Furthermore, this view is strengthened by the legislative construction long acquiesced in as evidenced by the act imposing upon county boards of equalization the powers and duties, as hereinbefore pointed out, of raising or lowering valuations returned by the assessor, even though it may greatly augment the total valuation of the county.

Peculiarly applicable on this point is certain language from an opinion of the court of appeals of Kentucky in a case determined under a constitutional provision requiring the election of a county assessor for a definite period, but silent as to his duties. In that case, *Spalding v. Hill,* 86 Ky. 656, 660, 7 S. W. 27, 28, it is said:

"The constitution of the state requires that a county assessor shall be elected every four years; but his duties are not prescribed by that instrument; his duties were wisely left to be prescribed by law. It is conceded that, 'in all cases of taxes by valuation, an assessment is indispensable and primary; it lies at the foundation of the proceeding.' But the action of the assessor in making the assessment is not necessarily final. His action is *ex parte*. It is true that the law authorizing the assessment may make his action final; but it is not necessarily final by virtue of his office. From the earliest history of the state, assessors have been employed for the purpose of making the primary valuation of the property in the several counties of the state; but at no period in the history of the state has the action of the assessors been regarded by the law making power as necessarily final; for laws have been passed time and again, creating county boards of supervisors, with the power to increase or decrease the value placed upon the citizens' property by the assessor."

And equally applicable is that from *State of Wisconsin ex rel. Brown County v. Meyers, Judge, etc.*, 52 Wis. 628, 632, 9 N. W. 777, 778, where, in considering a statute authorizing the appointment of three discreet freeholders, not residents or owners of real estate in the county, to review the aggregate valuations made by the county board of the taxable property in the several towns, villages, and cities of the county, it is said:

"The law is evidently in furtherance of justice and fairness in the equalization of values, and does not seem open to any constitutional objection; for this whole matter is within the control of the legislature, which, doubtless, might abolish the present system and create a state board for the assessment and equalization of the value of the taxable property of the state. At all events, such a law would be within the constitutional power of the legis-

lature.   Therefore the legislature may change the exist-
ing method and adopt one better calculated to insure
greater uniformity and fairness in the assessment and
equalization of the taxable property of the state, when
such a method can be devised.   A fair valuation of prop-
erty constitutes the very basis for the apportionment of a
tax, and is the main object to be secured in all legisla-
tion upon the subject.''

In *Board of State Tax Commissioners v. Board of
Assessors,* 124 Mich. 491, 494, 496, 83 N. W. 209, 210, the
constitutionality of a statute creating a tax commission
to supervise the assessment roll of the assessors, was
under consideration.   The court therein used the follow-
ing pertinent language, to-wit:

''It gets down, then, to the question whether the ex-
clusive agency for making such assessments is, under our
constitution, some officer of the municipality, whose acts
are final and conclusive as well to the state as to the mu-
nicipality; for it is to be kept in view that, both at the time
of the adoption of the constitution and at the present,
the taxes levied for state purposes are based on the same
assessment as are those collected for local use.   *   *   *
The state is concerned in the proper assessment of prop-
erty, not only as to its own interests as they are affected
by the collection or failure to collect the funds necessary
to carry on government, but, as the supreme authority in
the state, the legislature is required by section 12, art.
14, of the constitution, to see to it that assessments be
made on property at its real value.   We think that the
authority of the legislature is not so restricted as to pre-
clude the use of a state board in carrying into effect this
important constitutional provision.   *   *   *   It is
suggested that inasmuch as section 13, art. 14 provides
for a state board of equalization, this excludes the right
to authorize such a board as the board of state tax com-

missioners. This is based upon the claim that the board of equalization is in one sense an assessing board; but an examination of this act discloses that none of the duties of the state board of equalization are interfered with in any way.''

In the light of these decisions, and bearing in mind the constitutional duty imposed upon the general assembly to provide by law for a state tax sufficient, with other resources, to defray the estimated expenses of the state government for each fiscal year, the constitutional limitation of the rate of taxation on property for state purposes, the necessity for uniformity, and the constitutional mandate that taxes shall be levied under a plan which shall secure a just valuation for the purposes of taxation, it would seem that there should be no doubt as to the power of the general assembly to create a central body, and empower it with the duty of performing those functions of assessment, in each county, essential to bring the property therein for taxation purposes to its full cash value, the standard by it prescribed to insure a just valuation. Such law would in no wise interfere with the constitutional powers of the state or county boards of equalization, and would be, in effect, the same power previously conferred by statute, § 38, G. L., *supra,* upon county boards of equalization.

Indeed, almost every state in the union has provisions, either in its constitution or statutes, authorizing some central body to examine into the assessment of the several counties, and in case the assessment of one or more counties is found to be relatively higher or lower than other counties, to increase or dimish such assessment, even though the effect be to greatly increase the aggregate of the total assessments from all counties.— *Wallace et al. v. Bullen,* 6 Okla. 17, 52 Pac. 954, and on rehearing, p. 757, overruling *Gray v. Stiles,* 6 Okla. 455, 49

Pac. 1083; *State ex rel. v. Thomas,* 16 Utah 86, 50 Pac. 615.

Indiana has a state tax commission law very similar to ours.  A number of cases have been tried there involving the constitutionality of the act, and it has been uniformly upheld.  In *C. C. C. & St. Louis R. W. Co. v. Backus,* 133 Ind. 513, 536, 33 N. E. 421, 428, 18 L. R. A. 729, it is said:

"As to the latter clause of the section of the constitution providing that the general assembly 'shall prescribe such regulations as shall secure a just valuation for taxation,' it leaves it to the legislature to prescribe the mode by which the valuation of all property shall be ascertained, enjoining upon them the one obligation to provide such regulations as shall secure a just valuation."

The state of Arkansas has also, by statute, created a state tax commission and conferred upon it the general supervision of the assessment and collection of taxes, and over the county assessors and other officers, and given it the power to revise the action of such officials.  The constitutionality of the act has been sustained.  See *Bank v. Tax Commission,* 92 Ark. 492, 123 S. W. 754.

We find nothing in our constitution, either directly or by necessary implication, which inhibits the legislature from creating such a body and investing it with such power, nor do we find anything in the decisions of our courts to prevent it.  While in *People ex rel v. Lothrop, supra,* it was said, in view of the fact that a county assessor is a constitutional officer, and of other constitutional provisions, that "it may be gravely doubted whether it is competent for the legislative authority to take from county assessors the substantial control of valuations of property for state taxation, and vest it in a central authority," the matter was not determined.  On

the contrary, the court expressly said, that "The question here presented is not what the legislative authority could do in this respect, but what it has done." And *In re Assessment of Property, etc.,* 25 Colo. 296, 53 Pac. 1056, wherein we had under consideration certain interrogatories propounded to the court, including one as to the power of the state board of equalization to increase the aggregate assessed valuation as returned by the county assessors, we expressly stated that as the general assembly had not seen fit to exercise the power claimed to be inherent, by passing a law authorizing the state board of equalization to perform such functions, we would not review the powers of that board as determined in the Lothrop decision. However, when the *In re Assessment* case was before us, Judge Elliott, who had previously, for many years, been an honored and able member of this court, filed a brief as *amicus curiae,* and in discussing the doubt expressed in the *Lothrop* case, as to the authority of the general assembly, under the constitution, to create and invest a central body with power to increase the aggregate valuations returned by the several county assessors, said:

"While in this brief no special effort is made to controvert the doubt thus expressed in the *Lothrop* case, for the reason that the legislature has not attempted such legislation, we do not for one moment doubt the power of the legislature to pass general laws which shall be effectual to secure 'a just valuation for taxation of all property, real and personal,' even though the result might be the increasing of the average valuation of the county assessors. It would be a strange conclusion to hold that the legislature has not the power to pass such laws and prescribe such regulations as the constitution expressly provides shall be passed to carry into effect its essential guaranties." Supreme Court Briefs, vol. 166.

Nor do we consider that what was determined, or the language found in *Taxation of Mining Claims,* 9 Colo. 635, 21 Pac. 476, in any wise militates against the views herein expressed.  As pointed out in *Ames v. The People, supra,* the only question in that case was as to the constitutionality of certain bills before the general assembly for taxing mining claims, and the only 'point calling for a decision was whether or not the general assembly itself could assess property for the purposes of taxation.  In holding that it could not the court added that, in general, the valuation of property for taxation must be ascertained by the county assessors.  But it is further said in the *Ames* case that, "The remark of the court that, in general, property is to be assessed by the county assessors, was not at all necessary to the decision, nor was there any intention to announce the rule that railroad property was to be assessed by them only."

Having determined that the general assembly may create a central body and confer upon it general supervision of the assessment and collection of taxes, and likewise over officers authorized by statute to perform such functions, we will advance to a consideration of the pertinent provisions of the statutes of this state creating and defining the Colorado tax commission under which, if at all, the increase ordered in the assessed valuations here involved can be upheld.

Chapter 216 of the Laws of 1911 created the Colorado tax commission and defined its duties.  This act in some particulars was amended in 1913, S. L. p. 525.  Subdivision 1, § 13 of the act of 1911, p. 615, purports to invest the tax commission with authority to cause all property of every kind or character to be assessed at its actual and full cash value, and, to that end, confers upon it general supervision over the administration and the enforcement of all laws for the assessment, levying and

collection of taxes, and like supervision over the county officers, boards of county commissioners, county boards of equalization, and all other officers and boards of assessment, levy and collection. The supervisory power here conferred can, of course, not be exercised to the extent of unduly interfering with constitutional duties imposed upon any such officers or boards, and if any clause of the statute can not be so construed, it is necessarily invalid in that respect, but this would not overturn its other provisions. It can not be doubted that the primary and manifest purpose of the act is to place in a central body authority to bring the valuations of taxable property to the legislative standard of full cash value. In the exercise of the power conferred at least two methods are prescribed whereby the central body may bring about the desired result. One method is provided for by subdivision 6 of § 13, *supra,* and the other by § 31 of the act. By the former method certain statutory powers of county boards of equalization are necessarily taken away, for the tax commission is authorized thereby to reappraise classes of property within counties; to increase or diminish the values placed thereon by county assessors; and to require omitted property therein to be placed upon the assessment roll. Indeed, § 5638, R. S. 1908, pertaining to the increase or decrease of valuations by county boards of equalization, was expressly repealed by § 12, chap. 134, S. L. 1913. By the other method the tax commission may deal with the aggregate values of the several counties as primarily fixed by the county assessors or equalized by the county boards of equalization. The method prescribed by subdivision 6 of § 13, *supra,* is to be applied to the property of individual taxpayers, and is evidently intended to be exercised when the tax commission is of the opinion that the primary assessment made by the assessor has omitted property subject to taxation or has placed upon the property of certain individuals a

value higher or lower respectively than that placed upon
the property of other individuals and is unwilling to
leave the matter solely subject to the action of the county
board of equalization.  On the contrary, the method pre-
scribed by § 31 is to be applied to, and upon, the aggregate
value of all the property in the county, and is evidently
intended to be exercised when the tax commission is of
the opinion that the primary assessment and valuation
of property made and fixed by a county assessor is rela-
tively equal as among the property owners therein, or
will be corrected, in that respect, by the county board of
equalization, in whom is vested final power in that regard.
Moreover, the power invested by subdivision 6 of § 13
can only be exercised prior to the action of the county
board of equalization, to the end that it may perform its
constitutional duties to adjust and equalize the property
values within the county as between classes of property
therein and owners thereof.  But, as that board has only
the constitutional power to adjust and equalize, but not
to increase the aggregate values within the county, it
would seem that it is wholly immaterial whether the
action of the tax commission, under the me+hod pre-
scribed by the latter section, was exercised before, or
after, the action of the county board of equalization.  In
any event, the rate of increase and the relative effect on
property owners would be the same.  This would also
seem to be the legislative view as evidenced by the dates
prescribed for the different meetings of the county board
of equalization, and the limited time in which the tax
commission may exercise the power conferred upon it
by § 31.

This view is further fortified by other provisions of
the act.  Subdivision 7 of § 13 provides for the giving of
notice to the owner of property and fixing a time and
place for a hearing.  This notice, however, applies only
in cases where the tax commission is exercising its power

under the procedure prescribed- by subdivision 6 of the section, and does not apply when a horizontal increase or decrease by a designated rate per cent or amount to be added is ordered by the tax commission under the provisions of § 31. This is conceded by all parties to the controversy, and it is upon this assumption that respondent has interposed, as a defense, the constitutional provisions inhibiting the taking of property without due process of law. To this contention there are many sufficient answers: As said in *Turpin v. Lemon*, 187 U. S. 51, 57, 58, 47 L. Ed. 70, 23 Sup. Ct. 20, 28:

"Exactly what due process of law requires in the assessment and collection of general taxes has never yet been decided by this court, although we have had frequent occasion to hold that, in proceedings for the condemnation of land under the laws of eminent domain, or for the imposition of special taxes for local improvements, notice to the owner at some stage of the proceedings, as well as an opportunity to defend, is essential. * * * *But laws for the assessment and collection of general taxes stand upon a somewhat different footing and are construed with the utmost liberality, sometimes even to the extent of holding that no notice whatever is necessary.*"

Moreover, under the law as it existed prior to the adoption of the act of 1911, and as it now is, the state board of equalization is required to meet at a certain place, on a certain day, and to complete its labors by another day. It has never been questioned that such board has the right, without further notice than that implied by the law, to equalize valuations of the property among the counties by raising the valuation in one or more and reducing it in others. The only question that has been raised is as to whether the aggregate valuation of the counties might be increased. But whether the aggregate is increased or not, the same legal principle

is involved, because equalizing under any system, if there be change at all, necessarily raises the valuations in some county or counties. This affects the valuation of the individual property owner, yet at no time in the history of the state was it ever provided or assumed that he was entitled to a specific notice or hearing. However, the rule is settled by numerous authorities that actual notice to the individual taxpayer is not required as a condition precedent to action by state boards of equalization, notwithstanding such boards may exercise the power of increasing or decreasing the aggregate valuations as returned from the respective counties. The rule is equally well settled that the only notice necessary in such cases is the law which fixes the time and place of the holding of the meetings of such boards. McGehee on Due Process of Law, pp. 232, 238; Cooley on Taxation (3rd ed.), pp. 53, 55; *State v. Armstrong,* 19 Utah 117, 56 Pac. 1076; *State Railroad Tax Cases,* 92 U. S. 575, 23 L. Ed. 663; *Territory v. Bank,* 10 N. M. 283, 65 Pac. 172; *McMillen v. Anderson,* 95 U. S. 37, 41, 24 L. Ed. 335; *Hagar v. Reclamation Dist.,* 111 U. S. 701, 4 Sup. Ct. 663, 28 L. Ed. 569; *Kelly v. Pittsburg,* 104 U. S. 78, 79, 26 L. Ed. 658; *Kentucky Railroad Tax Cases,* 115 U. S. 321, 6 Sup. Ct. 57, 29 L. Ed. 414; *Carrico v. Crocker* (Okl.) 133 Pac. 181.

In *State Railroad Tax Cases, supra,* in speaking upon this subject, it is said:

"The main function of this board is to equalize these assessments over the whole state. If they find that a county has had its property assessed too high in reference to the general standard, they may reduce its valuation; if it has been fixed too low, they raise it to that standard. When they raise it in any county, they necessarily raise it on the property of every individual who owns any in that county. Must each one of these have notice and a separate hearing? If a railroad company is by law entitled to such notice, surely every individual is

equally entitled to it. Yet, if this be so, the expense of giving notice, the delay of hearing each individual, would render the exercise of the main function of this board impossible. The very moment you come to apply to the individual the right claimed by the corporation in this case, its absurdity is apparent. Nor is there any hardship in the matter. This board has its time of sitting fixed by law. Its sessions are not secret. No obstruction exists to the appearance of any one before it to assert a right or redress a wrong; and, in the business of assessing taxes, this is all that can be reasonably asked.''

So in *Suydam v. Merrick Co.*, 19 Nebr. 1551, 27 N. W. 142, Mr. Justice Cobb, speaking for the court, said:

''When complaint is made that a certain individual is assessed too low, then it is a condition precedent to action thereon by the board, that such individual owner have notice of such proceeding. But the increase of the assessment of a precinct is not made upon anyone's complaint, but arises in the official mind and judgment of the commissioners, upon an inspection and comparison of the assessment rolls of the several precincts. The law has designated no officer or person upon whom notice could be served, or to represent the precinct at such equalization. The county commissioners themselves are the only and proper representatives of the precinct, and, as they constitute the board of equalization, no notice need be served on them.''

In *Pittsburg, etc., Ry. Co. v. Backus,* 154 U. S. 421, 425, 38 L. Ed. 1031, 14 Sup. Ct. 1114, 1116, Mr. Justice Brewer, speaking for the court, said:

''It is contended specifically, that the act fails of due process of law respecting the assessment, in that it does not require notice by the state board at any time before the assessments are made final, and several authorities

are cited in support of the proposition that it is essential to the validity of any proceeding by which the property of the individual is taken that notice must be given at some time and in some form, before the final adjudication. But the difficulty with this argument is that it has no foundation in fact. The statute names the time and place for the meeting of the assessing board, and that is sufficient in tax proceedings; personal notice is unnecessary. In *State Railroad Tax Cases,* page 610, 23 L. Ed. 663, are there words, which are also quoted with approval in the *Kentucky Railroad Tax Cases:*

" 'This board has its time of sitting fixed by law. Its sessions are not secret. No obstruction exists to the appearance of anyone before it to assert a right, or redress a wrong; and, in the business of assessing taxes, this is all that can be reasonably asked.' "

In *Territory v. First National Bank,* 10 N. M. 283, 303, 65 Pac. 172, it is said:

"The statute relating to the assessment of property within the county requires, that where the board of equalization or the assessor increases the valuation of property as returned by the taxpayer that notice of such increase shall be given the taxpayer affected, and the object of this notice is to give the taxpayer an opportunity to object to the altering of the assessment and to appeal if he so desires, but there is no such provision in regard to the action of the territorial board of equalization. This failure to provide for such notice was, no doubt, intentional on the part of the legislature, because it would be both expensive and burdensome; in fact, it would be practically impossible to notify all individual taxpayers whose assessments might be affected by the territorial board of equalization, in their effort to secure the reasonable uniformity required by law. Indeed, it might happen that almost all the taxpayers of a county

or the territory might be affected by the action of the board of equalization, and it would be unreasonable to require a notice to be served upon all who might be affected by the action of such territorial board of equalization. It is reasonable to believe that the legislature in fixing a specified date upon which this board should meet, clothed with territorial jurisdiction for the purpose of equalizing the valuations of the property of the territory, deemed this a sufficient notification to all parties interested to attend the meetings of such board, and there to look after any interests liable to be affected by the action of the board within the scope of its powers, and for that reason made no further provision for notice.''

In *McMillen v. Anderson,* 95 U. S. 37, 24 L. Ed. 335, it is said:

''It seems to be supposed that it is essential to the validity of this tax that the party charged should have been present, or had an opportunity to be present, in some tribunal when he was assessed, but this is not, and never has been, considered necessary to the validity of a tax.''

The same doctrine was announced and affirmed in the *Kentucky Railroad Case,* 115 U. S. 321, 29 L. Ed. 414, 6 Sup. Ct. 57. It would seem, therefore, that where such a notice has not been provided for in the laws of the state, the courts hold that the failure to provide for or give the taxpayer a specific notice, does not affect the validity of the tax. The principle declared in these cases, as to the sufficiency of notice essential to authorize equalization boards to act, applies with like force to the tax commission when proceeding under the provisions of § 31, *supra.* The latter body is empowered by the legislature to cause to be added to or deducted from the valuation of the various counties the amount necessary to place upon the assessment rolls of the state the taxable property therein at the true and full cash value. Its place

and time of holding meetings, like the state board of equalization, are fixed by statute. It is required to be in continuous session, and its meetings to be open to the public. Moreover, the assessors have until the first Monday of September in which to transmit to the commission their respective abstracts of assessment, and the latter body is required to act under § 31 on or before October 1st. So, it necessarily follows that the time in which the tax commission may exercise the power under the section is limited to a few days. §§ 9, 30 and 31, S. L. 1911, pp. 612, 622, 623.

Furthermore, the tax commission, by § 15 of the act, is expressly authorized to receive complaints, and carefully examine into all cases, where it is alleged that property, subject to taxation, has not been assessed, or has been fraudulently or for any reason improperly or unfairly assessed, etc. Here is an express provision for an opportunity to be heard which, with the notice given by the statute of the time and place of the meeting of the tax commission, surely constitutes due process of law. We think respondent does not properly interpret *Gale v. Statler*, 47 Colo. 72, upon which he relies. While in that case it was held that notice and an opportunity for hearing must be given a taxpayer when the assessor raises the valuation of his property, the case involved the placing upon the rolls property that had been omitted, and the statute in relation thereto expressly provides that notice must be given. So, under the tax commission statute, when complaint is made or knowledge comes to the tax commission that the property of a certain individual in any county is assessed improperly, too high, or too low, then it is a condition precedent to action thereon by the commission, that such individual have actual notice, and an opportunity to be heard as provided by the act. But, paraphrasing the language of Mr. Justice Miller in the *State Railroad Tax Cases, supra,* the

increase in the assessment of an entire county is not made upon anyone's complaint, but arises in the official mind and judgment of the commission upon an inspection and comparison of the assessment rolls of the several counties, and the law has designated no officer or person upon whom notice can be served, or to represent the county at such equalization. Whosoever will, whose rights are affected, may appear at the time and place fixed by law, and be heard if he is not precluded therefrom by prior legal proceedings in the premises. Moreover, after the tax commission completes its labors, and transmits its assessment to the state board of equalization, the latter body meets in regular session, at a place and time designated by statute to perform its constitutional duty of equalizing the valuations among the several counties. In that respect it is supreme, except that it can not change the aggregate of the total valuation of all the counties. It may decrease the valuation of one or more counties by raising the valuation in others and correct any inequalities in that respect.

As to the contention that all property in the city and county of Denver was valued by the county assessor at its full cash value, and that the proposed increase ordered by the tax commission, and confirmed by the state board of equalization, will result in an over-valuation of property, and therefore operate as a discrimination against the taxpayers of the district, in that it compels them to pay taxes on property they do not possess, in violation of the constitutional rule requiring taxation to be uniform and according to a just valuation, it is sufficient to say, that it is not conceded that the property assessed as valued by the county assessor is at its full cash value. It is conclusively presumed, however, that as between individual property owners within the county, there has been a just value placed thereon, that is, a value relatively equal. If the latter has not been done the fault

lies, in the first instance, upon the assessor of the county who neglected his duty in that regard, and, secondly, upon the tax commission, but, finally and conclusively, upon the county board of equalization, possessed of supreme power in that respect. The values placed on property listed with, and assessed by the county assessor, are not conclusive and binding on the tax commission as being the true cash values thereof. Under the constitution and statute values of property on which taxes are to be levied, are to be determined not by the county assessor alone, but only in conjunction with other officers, and boards provided for the purpose of correcting errors and inequalities in valuations as fixed by the assessor and to bring all property values to the legislative standard. The local officers are in no wise unlawfully deprived of the right to exercise their functions. As said in *State v. Daniels,* *supra:*

"It must be remembered that, so long as the local officers obey the laws of the state they are not meddled with and their functions are in no way curtailed, and it is only when they violate the law which they are bound to obey that the state undertakes to interfere. * * * The state has a vital interest in insisting that its laws pertaining to taxation be honestly and fairly administered, to the end that the burden of taxation may be equitably distributed. * * * In order to make an equal distribution of the county and state taxes it is essential that all taxable property that can be discovered be placed upon the tax rolls and that a uniform basis for valuation be adopted and adhered to. So long as the practice prevails of assessing property in different localities at figures varying from twenty-five to one hundred per cent or more of its true value, and of doing the same thing locally for that matter, so long are we liable to have gross inequalities in the distribution of the tax burden. So the state in endeavoring to enforce the

requirements of the law in regard to the assessment and equalization of property, is not acting as a mere interloper, exercising a paternalistic function for the purpose of exploiting its right so to do, but is attempting in good faith to perform a duty in which its citizens generally have something more than a passing interest. All the state has undertaken to do is to review the work done by local officers when its proper agencies are satisfied that the law has been violated. In such a contingency the law in substance and effect provides for a reassessment of the property of the local municipality.''

Any one familiar with the history of taxation in this state can readily realize the purpose and necessity of the legislature enacting chapter 216 of the Session Laws of 1911. All the statutes, adopted previous to this law, had proven inadequate to coerce the assessors to fix a full cash value, as required by law, upon the taxable property within the county. Moreover, they had likewise failed to place a relatively equal value upon the same class of property within their respective counties, and county commissioners and boards of equalization had not corrected the evil. It, no doubt, became apparent to the general assembly that the assessment of property could not be entrusted solely to the local assessors and local boards, for the reason that such officials continually assessed property far below its real value, justifying their acts in that respect on the assertion that other counties did likewise. Indeed, history discloses that such has been the experience of many of the states of the union, and imperative necessity, there as here, has required the creation of central bodies with power to correct assessment rolls, and increase or lower the valuations placed upon property for taxation purposes by the local authorities.

It also became apparent to the legislature, no doubt, that in order to enable the state to secure sufficient reve-

nue to carry on its functions of government, and to support its public institutions, a new method must be adopted; a method which would not only secure a just valuation as between the taxpayers of the state, but also a valuation that would be just to the state itself. Accordingly, it became manifest that full cash value is the only standard that is just and uniform, and whereby each citizen can be required to contribute to the support of government according to the value of his property. For, so long as the prevailing practice of assessing property in different localities at figures varying from twenty-five to one hundred per cent of its cash value, there will be gross inequalities in distribution of the tax burden. Valuation of property for taxation is made only to secure a basis for levying taxes; and if values are raised to conform to the standard which the law has fixed, the tax levy should be correspondingly reduced. There is a common impression that increase of valuation necessarily increases the amount of taxes to be paid, and that the raise made by the tax commission for the year 1913 will greatly add to the tax burden of the community. This is clearly a misapprehension of the effect of the law, and of the acts of the commission. As a concrete example, we take notice that the total valuation of property in and for the city and county of Denver, under the assessment returned for 1912, was $133,835,040. The state mill rate for that year, including the specially authorized 1/18 mill, was 4 1/18 mills, and produced a state revenue of $542,775.04. For the year 1913 the total valuation for that district, as fixed by the tax commission, was $402,205,614, while the state mill rate is fixed at 1.3 mills, producing a revenue of $522,867.03, or $19,908.02 less for state purposes than for the preceding year. So, it is readily seen that it does not follow that an enforcement of the rule of full cash value as the standard for assessment necessarily increases the amount of taxes to be paid. On the contrary,

it rather demonstrates that the only correct theory of taxation is to fix values at the full cash standard, the only really just and equitable one, followed by a low rate of levy. It may be true that in counties which have paid less than their just proportion of taxes to the state in the past, an increase will be required, and it is equally true that in those counties which have paid more than their proportion of state taxes, a reduction will follow, a result eminently fair and proper. The constitution limits the maximum of the levy for general state purposes to four mills on the dollar, and the tax levying authorities for that purpose may make it as much less as in their judgment they deem proper. What is true as to state revenue is equally true in relation to local taxation. Local officers and boards under the discretion vested in them have power to fix levies for local purposes, subject to the limitations placed upon them by law. Therefore, as valuations are increased in any district, to bring them to the true standard, proportionate reductions in levies should be made, and the burden of taxation for local purposes should not be increased. Local officers and boards are directly responsible to the people who have chosen them to carry out this important function of government. It will not be presumed, therefore, that in raising the standard of value above that which has prevailed in practice in the past, they will betray their trust by seeking to raise more revenue than will meet the needs of local government. Should this be attempted the responsibility is solely with the local authorities, and the remedy is with the people. Equality and uniformity are essential to the constitutionality of taxation, and no one should complain of a law which has this for its primary and controlling object. It is, perhaps, true that in any change from one system to another some injustice and hardship will, for the time being, be imposed in certain cases. But unless the standard which is provided by law, the full cash

value, thus the just value demanded by the constitution, be enforced, the same unfortunate, unequal and unjust conditions which have heretofore existed in this state, will continue indefinitely.

That an unsuccessful effort was made in 1912 to amend § 15 of art. X of the constitution, so as to create thereby a central body under the name of "The Colorado Tax Commission," and vest it with power to adjust, equalize, raise or lower the valuation of real and personal property among the several counties of the state, and to constitute for each county a county board of equalization, with like powers within their respective counties, their work, subject, however, to revision, change and amendment by the aforesaid central body, in no sense affects the validity of the statute, nor constitutes a legislative interpretation thereof. Surely, no court will assume that the legislative power enacted a law, believing it to be unconstitutional, and sought to correct its efforts at legislation in that regard by submitting a proposed constitutional amendment to a vote of the people. Neither will it assume that, because the people refused to create a central constitutional body and invest it with both constitutional and statutory powers previously invested respectively in distinct bodies, one constitutional and the other statutory, that thereby they placed a legislative construction upon a statute creating such statutory body and defining its duties. There is a vast and important difference between lodging these powers in one or two bodies. Moreover, that which the people might be willing to do by statutory enactment they might be wholly unwilling to do by constitutional pronouncement.

The fact that petitioner has sought to sustain the acts here involved upon the theory that they were performed by the state board of equalization, and that the performance of them by the tax commission was only

advisory to that board, is not controlling. The matters involved pertain to grave governmental functions, invested by the legislative power of the state in a particular board, and cannot be affected by the admissions of some public official or citizen, when the relief adjudged only sustains the lawful acts of that agency, and is clearly within, and warranted by, the pleadings. That such is the scope of the pleadings is manifest from an inspection of the alternative writ and the return thereto. Subdivision 6 of the former sets forth: "that the assessors of the various counties of the state on or before September 1, 1913, transmitted to The Colorado Tax Commission their various abstracts showing the real and personal property assessed by them in their respective counties and the value thereof." Subdivision 7 of the alternative writ alleges:

"That the Colorado tax commission, after receiving the abstracts of the various assessors of the state as aforesaid, examined each and all of said abstracts for the purpose of determining whether the real and personal property of the several counties of the state had been assessed at its true and full cash value, and that after having examined all of said abstracts and after having secured information for the purpose of determining the true and full cash value of the real and personal property of the counties of the state, said commission, on, to-wit, the first day of October, 1913, found and determined the amount of increase or decrease in the valuation of said real and personal property of the respective counties which would place said property on the assessment roll at its true cash value, and on said day issued an order to said Pitcher as assessor of the city and county of Denver, ordering and directing him to add to his valuation of property within said city and county of Denver, the amount of $101,902,088 so found necessary to be added in order to place said property on the assessment roll at its

full and true cash value; and that after said commission had determined upon the true value of the real and personal property of the several counties, it made a report of its actions and findings and transmitted the same to the state board of equalization, which said statement showed the amount to be added or deducted from the valuation of the real and personal property of each county, and which statement specified the amount to be added to or be deducted from the valuation of such real and personal property, and that said commission in determining the valuation to be placed on the real and personal property of the various counties of the state, proceeded in all respects according to the provisions of the law in such cases made and provided."

And in subdivision 13 of the alternative writ appears the command of this court as follows:

"Wherefore, we command you, the said Clair J. Pitcher, commissioner of finance and ex-officio assessor of the city and county of Denver, Colorado, your successors, deputies, assistants and subordinates, immediately upon receipt or service of this alternative writ of mandamus, to make such additions or corrections in your assessment and assessment roll and in the assessment and assessment roll of said city and county of Denver for the year 1913 as is or may be necessary to carry out the directions of the state board of equalization and the Colorado tax commission, as you are bound to do under the constitution and laws of the state of Colorado," etc.

Turning to § 32 of the statute, we find that the things herein set forth as having been done and performed by the tax commission are the acts and things which that body is authorized and required to do, and are, therefore, primarily its acts. However, as that which the tax commission orders done in the premises may be changed by the state board of equalization in adjusting and equaliz-

ing valuations among the counties, the order of the former does not and can not become finally effective until the latter has acted. And, in that sense, that which may be enforced is the act of the state board of equalization. So, strictly and technically speaking, the theory of petitioner is correct, as it is the order of the state board of equalization as the result of the exercise of its constitutional power to adjust and equalize, that is enforced by this proceeding. In other words, the valuations made by a county assessor, supplemented and modified by the act of the tax commission and equalized by the county board of equalization, constitute the assessment of all the property situate exclusively therein for taxation purposes, as made and returned by the officers and agents duly authorized by law so to do; and it is the values, so fixed and determined, as returned from each county, that constitute the units upon which the state board of equalization acts in performing its constitutional function of adjusting and equalizing among the several counties. If it approves the several returns constituting the units aforesaid, as it did in the case at bar, it has discharged its duty in that respect, and when that is done the assessment of such property is complete. Moreover, it readily appears why the order of the tax commission in making a horizontal raise of the valuations in a county, should not be enforced until after equalization of values by the state board. Should it be done prior thereto it would be an expensive and useless thing, for it might be in that particular county the state board of equalization would lower such valuation and make a corresponding increase in another county or counties. Why change the values by a horizontal increase or decrease until it is known there will be no further like change required? It is claimed, however, that as § 1 of the act requires the tax commission to exercise its powers and perform its duties, subject to the direction and approval of the state board of equali-

zation, and § 33 thereof requires the latter body to examine the abstracts of assessment as submitted by the tax commission, and ''make a record of its action on the abstract of each county and certify the same to the county assessor,'' etc., the tax commission is only an agency of the state board of equalization. We are clearly of the opinion that the language in relation to that which the state board of equalization shall do, and its supervisory powers over the tax commission pertains to the exercise by the former body of its constitutional power to adjust and equalize. But, be that as it may, the force of the claim is deflected by the fact that the act of 1913, p. 525, amending the act of 1911, purports to confer upon the tax commission all statutory powers, duties and privileges theretofore exercised by the state board of equalization.

This case only demonstrates anew the wisdom of the general rule that public officials, whose duty it is to carry out statutory directions, should not be permitted to raise the constitutionality of statutes. *People v. Leddy*, 53 Colo. 109, 111, 123 Pac. 824. As said in *Ames v. The People, supra:*

''The reasons for this rule are apparent. Public policy and public necessity require prompt and efficient action from such officers, and when intrusted with the assessment of taxes and the collection and disbursement of the revenue, they have no right to refuse to perform ministerial duties prescribed by law because of any apprehension on their part that others may be injuriously affected by it, or that the statute prescribing such duties may be unconstitutional.''

The duties of respondent, after his assessment rolls had been delivered to the county commissioners, and his abstract transmitted to the tax commission, were purely ministerial. *Denver v. Pitcher*, 54 Colo. 203, 129 Pac. 1015. Whatever confusion has arisen, or may arise, in

the extension and collection of taxes growing out of the questions here involved, and whatever injustice exists between individual taxpayers, if any, by the assessment under consideration, must be attributed, ultimately, to the fact that local public officers have failed and refused to obey the mandate of the entire people of the state expressed through, and directed by, their legislative will. And were it not that the questions here determined are *publici juris,* we probably would not have permitted respondent to present the alleged unconstitutionality of the statute set up in his return to the alternative writ. We are of the opinion that the tax commission acted within the authority conferred upon it by statute, and that the statute, as to the matters here involved, is valid. The alternative writ should, therefore, be made absolute, and it is so ordered.

Decision *en banc.*

Mr. JUSTICE GABBERT, Mr. JUSTICE HILL and Mr. JUSTICE GARRIGUES dissenting.

Mr. JUSTICE GABBERT dissenting:

The state board of equalization raised the assessed valuations of property in the state about $187,000,000 above that returned by the assessors, the raise in the city and county of Denver alone being nearly $102,000,000. This action is upheld by the majority opinion on the ground that the commission raised the valuation of the property in the counties affected by increasing the value in each of these counties to its cash value; that this was an assessment of such property, and that the board in equalizing assessed valuations among the counties of the state treated this action of the commission as a re-assessment, and therefore did not increase the assessed valuations.

The act creating the state tax commission (see Session Laws 1911, chapter 216) does not confer power on the commission to assess the property in any county in a lump sum by a horizontal raise above the valuations returned by the assessors. Section 13 specifies in what circumstances the commission may re-assess or re-appraise the property in any county. Whether the authority thus conferred can be legally exercised is not involved, for the reason that the action of the commission which the majority opinion says was a re-assessment was not based upon these provisions. The commission and board claim to have raised the valuations above that returned by the assessors by virtue of the provisions of sections 31, 32 and 33 of the act. There is not a word in either of these sections which directly or indirectly authorizes the commission to re-assess the property in any county by determining its true cash value, or requires the board to treat any such action of the commission as a re-assessment. The act, as stated in section 13, does purport to authorize the commission to re-assess or re-appraise property in any county, in specified instances, and, clearly, had it been the intent to confer upon the commission, under sections 31 and 32, power to re-assess property by a horizontal raise, or any additional power to assess, and that the board, by section 33, was to treat such raise as an assessment, it would have been so stated.

Neither did the board regard the action of the commission as an assessment. From its resolution, which is the basis of this action, it appears, not that it equalized valuations returned by the assessors, or the commission, or both, but, "Has determined the amount of the valuation of the real and personal property of each county as will place said property on the assessment roll at its true and full cash value;" thus showing that its action was, in no sense, an equalization of valuations, but that it fixed the valuations in each of the counties affected, in such

sum as would place the property therein on the assessment roll, at its cash value.

The vital question, therefore, is whether the board in the exercise of its functions as a board of equalization has the authority to increase the aggregate valuations returned by the assessors. This must be determined by ascertaining, first, its authority under the constitution; and, second, whether the statutory provisions to which reference was made conferred such authority as will support its action.

The power of the board as a board of equalization, under the constitution, was determined in the *Lothrop* case, more than 36 years ago. It was there held that to concede it the power to increase the valuations returned by the local officials made it practically a board of assessors, with authority to fix and determine values as well as to adjust valuations; that the constitution provides for the election of an assessor in each of the counties of the state, and that the intention of the people, by his provision, was to preserve local control over the valuation of property for the purpose of taxation; that the power to fix and determine the valuations of real and personal property for this purpose was lodged in the assessors and board of county commissioners of the several counties of the state; and that when these officials had performed this duty the sum of the valuations of the several counties, as returned by them, must be taken as the aggregate valuation of all the property in the state, and was final and conclusive upon the board, and that it might, for the purpose of adjusting and equalizing, increase the valuation of one county, and decrease the valuation of another, but was without authority to increase the sum of all the valuations of the several counties of the state. In brief, it was held that the power of the board as a board of equalization was limited to reducing to a uniform basis

the valuations made by the local officials, so that the burden of taxation for state purposes would be apportioned equitably among the several counties of the state. The constitutional provision involved is no different now from what it was when the *Lothrop* case was decided.

The next question is whether the statutory provisions to which reference has been made authorize the board to increase the aggregate valuations returned by the assessors. These provisions purport to empower the commission to determine whether the total valuation of the property in any county as returned by the assessor is the true value thereof, and, if not, determine the increase or decrease which shall be made by such rate per cent as will place the property therein on the assessment roll at its cash value, and report this action to the board; that the board shall examine the abstracts of assessment as submitted by the commission, make a report of its action thereon, certify the same to the county assessor, who shall add to or deduct from the property in his county the per cent, and amount on the valuation thereof, "as it stands after it has been equalized by the state board of equalization." There is not a word in either of these sections which authorizes the board to increase the aggregate valuations returned by the assessors. On the contrary, the section which directs what the board shall do, requires it to direct what per cent of increase or decrease shall be made on the valuation after it has been equalized. As pointed out, the commission is not authorized to make an assessment by a horizontal raise, or reduction; so that the only values which the board can equalize must be those returned by the assessors.

If, however, it was the intention to confer upon the board authority to increase the aggregate valuations returned by the assessors its action is a nullity. In the *Lothrop* case it was claimed that by statute the board

was authorized to make such increase. Speaking to that point, the court said:

"Let us then inquire where, under our constitution and laws, this important power of determining the valuation of taxable property as a basis of taxation is lodged. The constitution provides (section 8, article 14) for the election in each county each alternate year of a county assessor. He is thus a constitutional officer and though his duties are left unprescribed the essential duties of an assessor must be presumed to have been contemplated. Is there not here a plain intention on the part of the people to preserve local control over the valuation of property for purposes of taxation? This local control existed under the territorial form of government under which they had been living, and is this not an effort to secure it beyond contingency?"

True, the increase ordered by the board is based upon the action and report of the commission increasing the valuations in the different counties. The latter, however is not authorized to re-assess by a horizontal raise,— so that the increase made by the board is not based upon an equalization of assessments, but an increase in valuations made by the commission, which it is without authority to make as an assessment. This increase by the board is attempted to be upheld by the attorney-general upon the ground that the commission by its action merely collected data, and furnished a statement to the board to aid it in performing its duties; that in this respect the commission acted in an advisory capacity; that from the information thus obtained the board determined that the valuations in each of the counties affected should be raised to a sum representing the cash value of the property involved. If this was the object of the statutory provisions under consideration, and they are to be given this construction, it is apparent that thereby an attempt

was made by the general assembly to confer authority upon an intermediary body to arbitrarily increase the aggregate valuations returned by the assessors, and by having it transmit a report of this action to the board confer that authority upon the latter. The general assembly can not by indirection accomplish that which the constitution directly inhibits. It can not authorize another body to increase the aggregate valuations as returned by the assessors with the requirement that this body report its action to the board, and thus vest the latter with power to do that which the constitution inhibits. It might just as well have undertaken to vest this authority in the state board in the first instance.

In my judgment every question necessary to consider was decided in the *Lothrop* case adversely to the contention of petitioner here, and, following that case, the alternative writ should be quashed and the proceedings dismissed.

In effect, the construction given the constitutional provision defining the powers of the board when acting in the capacity of a board of equalization, in the *Lothrop* case, made it a part of the constitution. It has been acquiesced in by the people for 36 years and after this lapse of time it must be conclusively presumed that they are satisfied with its provisions as thus construed and that this expressed their intent when adopted, otherwise they would have amended it. With due deference to my learned associates, I submit that to uphold the action of the board necessarily overrules the *Lothrop* case and results in amending the fundamental law—a power which the people alone can exercise.

GARRIGUES, J., dissenting:

I understand the majority opinion holds that the horizontal raise, which the assessor was ordered to add

to his original assessment, is a local assessment; also it concedes that under the constitution the state board of equalization is prohibited from making local assessments, that its power is limited to equalizing between the counties; but in the exercise of this power, it cannot increase the aggregate value of all the counties. To escape this inhibition and uphold the action of the state board of equalization, the majority opinion is based upon the theory that the tax commission, and not the state board of equalization, added this horizontal raise, and the local assessment consists of the original assessment, plus the horizontal raise; that is, in amount the local assessment is the assessor's original assessment, plus the added horizontal raise, and the state board of equalization adopted as a means or incident of equalization, but did not make this assessment; therefore it neither made a local assessment nor increased in amount the aggregate of all the assessments.

This contention to prevail, must be in harmony with the statute and the facts. In other words, there must be a statute authorizing the tax commission to assess in this manner, and the facts must show it made the assessment. It seems to me the majority opinion assumed without authority, both these points. The only statute covering the matter is found in sections 31, 32 and 33, Laws of 1911, page 623, which provide: If the tax commission shall be of the opinion that the assessor has not in his original assessment assessed the real and personal property of his county at its true cash value, it shall determine what increase, by rate per cent, will place the property on the assessment roll at its true cash value; that after it has done so, it shall transmit to the state board of equalization its determination, with a statement specifying the amount to be added; when this statement is received by the state board of equalization, it is made its duty to then examine the abstracts of assessment of each

county submitted to it by the tax commission, and make a record of the board's, not the commission's action, on each abstract, and certify the same to the assessor, who is required forthwith to add to the valuation of the real and personal property of his county the increase ordered, after it has been equalized by the state board.

There is nothing in these sections authorizing the tax commission to add to, or to order the assessor to add any amount to the original assessment, or to make a re-assessment or supplemental assessment by a horizontal raise, or in any manner, or to make any assessment of any kind, and, what is more, it did not do so. Let us follow what was actually done, and see if we can discover where the tax commission ordered this horizontal raise to be added, or made any assessment. In the opinion of the commission, the real and personal property of Denver county was not assessed by the assessor at its true cash value, and it found that a 40 per cent horizontal increase, if added to his assessment roll, would place the real and personal property of the county on the roll at its true cash value. What did it then do? As the statute required, it transmitted a statement of this finding to the state board of equalization, and its function in the premises was ended. It could do no more, and it did no more. The state board of equalization then began its work of equalizing, examined the abstracts of assessment of the counties as submitted by the tax commission, made a record of its action on the abstract of each county, certified the same to the county assessor of Denver county, and ordered him forthwith to add 40 per cent to the original valuation of his county. Now, under this statute, and these facts, who made the supplemental local assessment, the tax commission or the state board of equalization? Evidently the state board that ordered it, and I think the holding that it was made by the tax commission is a mere subterfuge that would not be tolerated by the courts in

any ordinary business transaction. I therefore am of the opinion that the state board of equalization attempted to make local assessments in the 58 counties of the state, and that it increases the aggregate assessed valuation of all the property of the state by $178,000,000, in round numbers, both of which it is prohibited from doing, and in which respects its action was and is void.

Mr. JUSTICE HILL dissenting:

I cannot agree with the conclusion. As I view it, the theory upon which the action is disposed of is not involved in the case. I cannot agree that the action was brought for the purpose of compelling the respondent to comply with any order, findings, or actions of the tax commission, save the order made by it based upon the authority of the actions and order made by the state board of equalization and then only in conjunction with the latter board's actions and order. To sustain this view I call attention to the orders of both boards, copies of which are set forth in the alternative writ; they are as follows:

"Denver, Colorado, October 22, 1913.

Mr. Clair J. Pitcher,

　　Assessor of City and County of Denver,

　　　　　　Denver, Colorado.

We, the undersigned members of the State Board of Equalization, hereby certify:

That at a meeting of the State Board of Equalization, held on the 20th day of October, 1913, which meeting was held for the purpose of examining the abstracts of assessment of the various assessors of the state for the year 1913, as submitted to said Board by the Colorado Tax Commission, and for the purpose of taking action on said abstracts and of equalizing the valuations of the real and personal property of the counties of the state, as provided by law, and for the purpose of fixing the rate of

tax to be levied and collected within the various counties of the state for state purposes, the following proceedings, among others, were had:

By resolution, duly adopted, the valuation of the real and personal property of the City and County of Denver was increased from $254,755,220, the amount returned in your abstract of assessment on property assessed by you, to $356,657,308, making an increase in valuation of your assessment of $101,902,088, the rate per cent of said increase being 40%.

And by resolution, duly adopted, the rate of tax which is to be levied and collected within the counties of the state for state purposes was fixed at 1.3 mills.

ELIAS M. AMMONS,
Governor,
M. A. LEDDY,
State Treasurer,
FRED FARRAR,
Attorney General,
JAMES B. PEARCE,
Secretary of State,
ROADY KENEHAN,
Auditor of State."

"Denver, Colorado, October 22, 1913.
Mr. Clair J. Pitcher,
Assessor of the City and County of Denver,
Denver, Colorado.

Dear Sir:

The State Equalization Board, at a meeting held October 20, 1913, raised the assessed valuation of the real and personal property of your county, as assessed by you, from $254,755,220 to $356,657,308, making an increase in valuation of $101,902,088, the rate per cent of said increase being 40%.

Said Board also fixed the rate of tax which is to be

levied and collected within your county for state purposes at 1 3/10ths mills.

You are therefore ordered and directed to correct your assessment roll by adding the above increase in valuation and your attention is also directed to Section 3, Page 527 of the Session Laws of 1913, pertaining to your duties as assessor.

Respectfully,<br>THE COLORADO TAX COMMISSION,<br>By John B. Phillips.

Attest:

S. E. Tucker, Secretary.''

It is these orders that the relators seek to have the respondent comply with, and none other. The order of the tax commission says that the state board, at, etc., raised the assessed valuation, etc., of your county, etc.; you are therefore ordered and directed to correct your assessment roll by adding the above increase. Wherefore? Because the state board of equalization has ordered the value raised, etc. What increase? That made by the state board of equalization. It appears to me there is no escape from this conclusion. This language interprets itself. That the state board of equalization thus understood it is further evidenced by the notice of the state auditor to the county clerk of the respondent's county. This order is set forth in the alternative writ; it is as follows:

"October 20, 1913.

To Otto F. Thum,

  Commissioner of Property of the

     City and County of Denver and Ex-officio

       Clerk of said City and County:

  At a meeting of the State Board of Equalization, held on the 20th day of October, A. D. 1913, which meeting was held for the purpose of fixing the rate of tax to be

levied and collected within the various counties of the state for state purposes, the following proceedings, among others, were had:

By resolution, duly adopted, the valuation of the real and personal property of the City and County of Denver was increased from $254,755,220.00 to $356,657,308.00, making an increase in valuation of $101,902,088.00, the rate per cent of said increase being forty per cent (40%).

And by resolution, duly adopted, the rate of tax which is to be levied and collected within the City and County of Denver for state purposes was fixed at 1.3 mills.

ROADY KENEHAN,<br>
State Auditor of the State of Colorado,<br>
Dictated by Attorney General.''

That the learned attorney general and his able assistants thus under stood it, is self-evident not only by his preparing the above notice for the auditor's office, as it discloses, but by a reading of his briefs which disclose that his position is, that it was made by the state board of equalization and that they had a right to so do. A portion of his opening brief reads:

''The state board of equalization, sitting as the final arbiter to determine the valuations to be placed upon the real and personal property of the county, acted strictly within the limits of its power. It increased the valuations of the counties in such amounts and by such rates per cent as in its judgment would place the property of the state on the assessment roll at its full cash value, and under the statutes, it is the duty of said board in equalizing to take as a standard, not an average county, not any fictitious or arbitrary standard, but the true and full cash value, as its standard for equalizing valuations. Not only is this standard the requirement of the statute, but

by fair implication it is the requirement of the constitution.''

In his reply brief he says:

''The only questions, as we have previously pointed out in our original brief, properly before this court are as to the powers of the state board of equalization in equalizing the valuations of the property between the counties; that is, first, as to whether the aggregate valuations of the counties can be increased or decreased; and, second, whether, under the provisions of our laws, due process of law is afforded the taxpayers.''

The concluding paragraph of his reply brief reads:

''We feel confident that the position we have taken is the only sound one that could be taken, and, notwithstanding the comprehensive brief prepared by the able counsel of the respondent herein, we believe our position should be sustained.''

It will thus be observed that the position which the learned attorney general says is the only sound one that could be taken, is not accepted by the majority; to analyze they say to him your position is not sound and cannot be accepted, while by having said that it is the only sound one, he, by inference, says to them that the theory upon which the case is disposed of is unsound. In this inference I agree with the attorney general. If his petition can be construed as alleging the execution of a former order by the tax commission he does not ask or seek to have it enforced; the action is not brought for that purpose, but his contention is to the contrary; the reasoning is apparent and that is because there is no statute which authorizes the commission to make such an order or any order before the state board of equalization performs its constitutional duty it must be conceded that without statutory authority such an order, if made, is a nullity.

In submitting what I have to say upon the subject, I shall first comment upon the position contended for by the attorney general, and upon the case brought by him. As it appears to me from the extracts in his briefs above set forth and portion of the pleadings, the relators instituted this suit to have recognized by the respondent and other county assessors certain authority as being vested in the state board of equalization, while the theory of the decision is that the state board is not possessed with this power, which decides the case brought adversely to the position taken by the attorney general, but which also holds that another board is possessed of that power, and for that reason the writ should issue. This position, if I read the briefs of the attorney general correctly, he concedes to be unsound.

I am unable to find anything in our constitution or statutes which permits of increases of values by the state board without an attempt at equalization. As I view it, the contention that the state board ordered these increases of values as an incident to equalization, is not supported by the record, but to the contrary it discloses that the efforts of the board were to practically re-assess the property, in order to have it placed upon what the board says is its true cash value; its resolution so states. It also shows that the tax commission purported to determine the value of the real and personal property in the several counties in the state assessed by the county assessors. This fact is thus stated in the resolution of the state board and is followed with the declaration that it, the state board, after having examined these abstracts, has determined the amount of the valuation of the real and personal property of each county as will place said property on the assessment roll at its true and full cash value. The declaration in this resolution that the Colorado tax commission determined these values in the manner provided by law is, as I view it, by the pleadings,

admitted to be incorrect. Other statements in the resolution disclose beyond contradiction that the efforts of the board were not to equalize values as between different counties, but were done as therein stated, for the purpose of placing said property on the assessment roll at its true and full cash value, that is, as determined by the board. In other words, it discloses that the state board of equalization made an effort at re-assessing the property which is not sanctioned by constitutional or statutory authority.

The alternative writ set forth the resolution of the board ordering these raises which includes the valuation of the individual property in each county in the state as returned by the county assessors, the increases as ordered by the state board and the total value as fixed by them. In detail, this discloses that they have increased the values as returned by the county assessors in fifty-eight counties, leaving the values as fixed by the county assessors in five counties unchanged (there being sixty-three counties in the state). By an examination of the auditor's report for the years 1911 and 1912 I find that the total value for the year 1912 of the property assessed by the county assessors in the five counties left unchanged by the state board amounts to $6,127,622, while the total increase for the present year for the other fifty-eight counties as fixed by the state board is approximately $187,000,000 and is in excess of $100,000,000 in the county represented by the respondent. These ordered increases vary from a fraction of one per cent to as high as one hundred thirty-six per cent, varying in the different counties, being forty per cent increase in the county of the respondent, and as I read the instructions of the state board and commission embodied in their notices to him, they mean that he must add this per cent of increase upon all the taxable property in his county which has been

assessed by him, but that it does not apply to the public utility property in his county which has been assessed by the tax commission. When these facts are taken into consideration it is apparent that the contention that these increases were ordered as an incident to equalization becomes farcical. To better illustrate this I have set forth a copy of that portion of the resolution of the state board adopted at its meeting upon October the 20th, covering this question. After the portion concerning the values, which is followed with the names of the counties in which no changes were made, I have set forth the value of the property assessed by the county assessor for the year 1912 in these counties, namely, Crowley, Dolores, Moffat, Park and Summit, all as follows:

"Whereas, The Colorado Tax Commission has heretofore and in the manner provided by law, determined the true value of the real and personal property in the several counties in the state and has transmitted to this board a statement of the amount to be added to or deducted from the valuation of the real and personal property of each county; and,

Whereas, This board has examined the abstracts of assessments of each county in the state of Colorado, as submitted by the Colorado Tax Commission; and,

Whereas, This board, after having examined said abstracts, has determined the amount of the valuation of the real and personal property of each county as will place said property on the assessment roll at its true and full cash value.

Be it therefore resolved, and it is hereby determined that the valuations of the various counties of the state as returned and shown by the respective abstracts of assessment of the respective assessors of the counties of the state be increased or decreased as follows.

| County. | Valuation by Assessor. | Increase by State Board of Equalization. | Total as Fixed by State Bd. of Equalization. |
|---|---|---|---|
| Adams ...... | $ 17,190,930 | $     27,321 | $ 17,228,251 |
| Alamosa ..... | 1,061,719 | 1,510,626 | 2,572,345 |
| Arapahoe .... | 12,729,700 | 35,610 | 12,765,310 |
| Archuleta .... | 2,245,845 | 149,558 | 2,395,403 |
| Baca ........ | 2,190,577 | 277,530 | 2,468,107 |
| Bent ........ | 7,095,035 | 174,015 | 7,269,150 |
| Boulder ..... | 31,609,896 | 1,264,396 | 32,874,292 |
| Chaffee ...... | 6,608,699 | 55,450 | 6,664,149 |
| Cheyenne .... | 2,506,289 | 2,828,230 | 5,334,519 |
| Clear Creek.. | 2,854,960 | 879,000 | 3,733,960 |
| Conejos ..... | 5,260,901 | 3,904,700 | 9,165,601 |
| Costilla ..... | 1,924,650 | 2,617,120 | 4,541,770 |
| Custer ...... | 1,740,860 | 553,086 | 2,294,046 |
| Delta ........ | 12,662,290 | 2,181,000 | 14,843,290 |
| Denver ...... | 254,755,220 | 101,902,088 | 356,657,308 |
| Douglas ..... | 5,519,965 | 52,565 | 5,572,530 |
| Eagle ....... | 2,898,079 | 959,680 | 3,857,759 |
| Elbert ....... | 5,524,038 | 1,444,752 | 6,968,790 |
| El Paso ..... | 53,885,620 | 67,942 | 53,953,562 |
| Fremont ..... | 12,729,902 | 3,182,475 | 15,912,377 |
| Garfield ..... | 11,405,215 | 155,088 | 11,560,303 |
| Hinsdale .... | 643,885 | 2,438 | 646,323 |
| Huerfano .... | 7,886,436 | 963,570 | 8,850,006 |
| Jackson ..... | 2,901,210 | 624,406 | 3,525,616 |
| Gilpin ....... | 3,113,623 | 769,680 | 3,383,303 |
| Grand ....... | 2,283,156 | 1,175,224 | 3,458,380 |
| Gunnison .... | 9,292,900 | 87,095 | 9,379,995 |
| Las Animas.. | 27,369,985 | 165,194 | 27,535,179 |
| Lincoln ...... | 4,883,670 | 2,310,637 | 7,194,307 |
| Logan ....... | 10,190,960 | 2,061,500 | 12,252,460 |
| Mesa ........ | 22,914,850 | 127,361 | 23,042,211 |
| Mineral ..... | 1,093,597 | 125,620 | 1,219,217 |
| Montezuma .. | 5,024,428 | 527,600 | 5,552,028 |

| County. | Valuation by Assessor. | Increase by State Board of Equalization. | Total as Fixed by State Bd. of Equalization. |
|---|---|---|---|
| Montrose .... | 10,823,975 | 123,033 | 10,947,008 |
| Morgan ..... | 10,418,534 | 2,053,680 | 12,472,214 |
| Otero ....... | 20,953,075 | 89,847 | 21,042,922 |
| Ouray ....... | 5,107,376 | 28,008 | 5,135,384 |
| Phillips ..... | 4,682,773 | 847,179 | 5,529,952 |
| Pitkin ....... | 4,627,795 | 199,355 | 4,827,150 |
| Pueblo ...... | 46,042,209 | 6,709,620 | 52,751,829 |
| Rio Blanco... | 2,976,205 | 1,742,920 | 4,719,125 |
| Rio Grande... | 4,118,840 | 4,841,160 | 8,960,000 |
| Routt ....... | 9,787,545 | 44,968 | 9,832,513 |
| San Juan .... | 4,005,519 | 248,260 | 4,253,779 |
| San Miguel... | 8,627,960 | 71,824 | 8,699,784 |
| Sedgwick .... | 4,145,170 | 53,109 | 4,198,279 |
| Teller ....... | 14,075,740 | 38,085 | 14,113,555 |
| Washington .. | 7,218,673 | 256,257 | 7,474,930 |
| Weld ........ | 37,180,260 | 23,447,440 | 60,627,700 |
| Yuma ....... | 7,398,195 | 113,674 | 7,511,869 |
| Saguache .... | 4,024,491 | 4,248,085 | 8,272,576 |
| Jefferson .... | 15,226,445 | 13,003 | 15,239,448 |
| Kiowa ....... | 2,288,930 | 1,722,645 | 4,011,575 |
| Kit Carson... | 5,407,916 | 2,374,354 | 7,782,270 |
| Lake ........ | 9,712,059 | 2,275,000 | 11,987,059 |
| La Plata ..... | 11,014,253 | 80,494 | 11,094,747 |
| Larimer ..... | 26,165,789 | 1,620,100 | 27,785,889 |
| Prowers ..... | 12,730,300 | 146,971 | 12,877,271 |
| Crowley ..... | Unchanged. | | |
| Dolores ..... | " | | |
| Moffat ...... | " | | |
| Park ........ | " | | |
| Summit ..... | " | | |

The value of the property assessed by the county assessors for the year 1912, as shown by the auditor's

report (see biennial report state auditor 1911-1912, pages 244-245), for these last named five counties was as follows:

| | |
|---|---|
| Crowley | $1,989,684.00 |
| Dolores | 309,337.00 |
| Moffat | 1,247,935.00 |
| Park | 1,361,309.00 |
| Summit | 1,219,357.00 |
| Total | $6,127,622.00 |

If a proper construction of the resolution is that the state board made these increases for the purpose, as therein stated, of placing the property on the assessment roll at its full cash value as determined by the board, then there is neither constitutional nor statutory authority for its so doing. The further contention that these increases were ordered as an incident to equalization is untenable, when the record and its effect are taken into consideration; but if attempted for this purpose it is in conflict with the announcements of this court in *People ex rel. v. Lothrop,* 3 Colo. 428, as well as the principles announced in *People v. Ames,* 27 Colo. 126, 60 Pac. 346; *Gale v. Statler,* 47 Colo. 72, 105 Pac. 858; *In re Questions of Governor,* 55 Colo. 17, 123 Pac. 661, and *Chase v. Boulder County,* 37 Colo. 268, 86 Pac. 1011, 11 Ann. Cas. 483.

As I view it, to sustain the action of the board for any reason set forth in the briefs would be to overrule the announcements in these former cases.

Subsequent to the *Lothrop* case this court in *In re Assessment of Property,* etc., 25 Colo. 296, 299, 53 Pac. 1056, 1057, said:

"The decision [referring to the *Lothrop* case] has also been acquiesced in by all of the departments of government and the people generally; and the general as-

sembly has not seen fit to exercise the power, which is claimed to be inherent, of passing a law authorizing the state board of equalization, in the discharge of its important duties, to increase the aggregate assessed valuation, as returned by the county assessors. In view of these considerations, and until the general assembly takes some action that requires it, we do not feel called upon, in this *ex parte* proceeding, to review our previous decision."

This announcement was at the April, 1898, term of this court. Up to that time the legislature had made no effort to change the statutes in existence at the time of the announcement in the *Lothrop* case. Thereafter, at the special session in 1902, it enacted general sections 5764 and 5765, which read:

"5764. Meeting of state board of equalization to equalize assessment.—Sec. 237. The state board of equalization shall sit on the first Monday of October in each year, at the executive office, for the purpose of examining, adjusting and equalizing the assessments in the several counties of the state."

"5765. Board may change aggregate valuation. Sec. 238. The board shall have the power to either increase or decrease the aggregate valuation of all taxable property, not to exceed in any year ten per cent of such aggregate valuation, and only as an incident to such equalization."

These sections continued in force until 1913, when section 5765 above referred to was specifically repealed. Page 527, Session Laws 1913. And no other provision was substituted which authorizes the state board of equalization to increase the aggregate valuation, but to the contrary the legislature, at its 1913 session divested the state board of equalization of all statutory power. Page 525,

Session Laws 1913. That the legislature never attempted to give them this right by anything contained in the acts of 1911 and 1913 is apparent not only by the acts themselves, which divested them of all statutory power, but by the further fact that during its 1913 session the legislature submitted to the people, to be voted upon at the 1914 election, a proposed amendment to the constitution giving to the state board of equalization the power to raise the valuation of the property in the several counties. Laws 1913, p. 215. Hence, even if we were to assume as contended that the *Lothrop* case was based upon statutory grounds, the legislature has taken from the state board all statutory right, without substituting anything in lieu thereof. This leaves the reasoning in the *Lothrop* case conclusive, regardless of which theory is accepted. That it has been acquiesced in and accepted as a rule of property in this state for about thirty-six years, is not disputed.

In *State v. Equalization Board,* 18 Mont. 473, 46 Pac. 266, the reasoning announced in the case of the *People v. Lothrop,* 3 Colo. 428, was accepted as sound and followed with the declaration that the weight of authority is decidedly with its conclusion.

*Wells, Fargo & Co. v. The Board of Equalization,* 56 Calif. 194, and *St. Joseph Lead Co. v. Simms,* 108 Mo. 222, 18 S. W. 906, are therein cited as in principle sustaining the same conclusion.

For this court to now say that the state board of equalization is possessed with the power to increase the aggregate of all the counties in such an amount as they think ought to have been fixed by the county assessors, would be to amend the constitution by judicial construction, and this at a time when we have pending a proposed constitutional amendment to be voted upon at the next election, which, if adopted, will give to the state board

the power which it is sought to have this court say that they are already possessed of. Such a decision would place the legislature in the ridiculous position of having submitted a constitutional amendment which embodies therein important questions which this court, through some process of reasoning, would now say is already a part of the constitution. This would be to accomplish by judicial construction what the legislature has sought to accomplish by an amendment to the constitution. Suppose that such a decision is given, and the people at the next election decide as they did at the last, when it was proposed to give the tax commission this power, that they do not care to grant even to the state board of equalization this extraordinary power, we would then be confronted with the ridiculous position of, by judicial construction, having declared a certain thing as being a part of the constitution which the people at the polls have declined to place in it, and the only way to then get rid of it would be to submit another constitutional amendment which would declare that a certain thing should come out of it, which is not in it, and which the people have declined to put in it, and which this court (about thirty-six years ago) held was not in it, and which the legislature as well as all departments of the state have recognized as not being in it until the effort which brought about this litigation was started. The condition following such results would be humorous were it not so serious a question.

In *Hacker v. Howe*, 72 Neb. 385, 101 N. W. 255, relied upon as supporting the position of the relators it was said:

"Concerning the contention that the state board in respect of the action taken did not equalize but reassessed the property of the several counties, raising the aggregate valuations thereof according to the percentage ap-

plied to each county, it may be said that, manifestly, the board has no power to increase valuations merely for the purpose of making such increase. The limitations of law relative to tax levies, the fixing of valuations and the equalization thereof, cannot be nullified and rendered impotent by an attempt to increase the aggregate of the grand assessment rolls under the guise of equalization. * · * * But, in the case at bar, we think it clear that the increase resulting from the action of the state board was purely incidental to a proper equalization of the assessment of the different counties as returned to that body. From the action taken it is fairly inferable that in 66 of the 90 counties of the state, property was found to be assessed uniformly and at its actual cash value, while, in 24 counties, the valuations placed upon property generally were relatively too low and required, in order that the rule of uniformity might be observed and equality attained, a raise of the aggregate valuation of those increased from two per cent in one instance to ten per cent in others. Surely it may not be said that, it having been ascertained that so nearly all of the property of the different counties had been assessed at its true value, in order to properly adjust and equalize, there must be a reduction of a certain percentage in this larger number of counties and a corresponding increase and less than was ordered in the smaller number, so that the grand total of the assessment roll should not be disturbed. While a plan or method of raising the value of some of the counties and lowering others may be generally resorted to in order to bring about equality, yet it would, in the present instance, be in a measure a perversion of the law to reduce below its actual value by far the larger proportion of the property in the state subject to taxation for the purpose of avoiding an actual increase in the total valuation of all property. The statute does not limit the state board in the matter of equalization to the ag-

gregate value as shown by the returns of all the different counties. Its provisions are that the board may increase or decrease by per centum to be added to or deducted from the aggregate value of the different counties to make them conform to law. Of course, they have authority to equalize; and to equalize is to adjust differences in values so as to bring all to a common standard, and to the end that all property assessed shall bear its just proportion of the burdens of taxation. Where equalization is the main object and the increase resulting therefrom is incidental, we think the action is undoubtedly a legitimate exercise of the powers conferred upon the board. If the object appears to be to raise the aggregate of the total assessed valuation, such action would, in our judgment, have to be condemned as an unwarranted exercise of the authority to equalize."

The court then comments upon its former opinion in *Suydam v. Merrick County*, 19 Neb. 155, 27 N. W. 142, and also the opinion in *Bardrick et al. v. Dillon et al.*, 7 Okla. 535, 54 Pac. 785, pertaining to which it says:

"The rule as thus announced in the opinion cited is probably stated too broadly. The opinion apparently overlooks the fact that the valuation of property assessed for taxation is primarily for assessing officers, and that boards of equalization except as conferred by statutes are not authorized to change the result, and then only in order to effectuate an adjustment of values so as to bring about uniformity. Our statute, we think, contemplates that the state board of equalization may equalize valuations as between the different counties in the sense the word is usually and ordinarily understood. That is, the state board is empowered to correct and adjust inequalities in valuation to the end that all property shall relatively be valued on the same basis for purposes of taxation, as near as the same is practicable."

It will be observed from the above quotations that our board has attempted to do what the supreme court of Nebraska holds cannot be done. The figures are self-evident that the object is to raise the aggregate of the total assessed valuation. The resolution states that the object was to place all property upon a full cash value. The inclusion of this statement is the exclusion of the theory that it was attempted for the purpose of equalization, but regardless of the statement the figures are self-evident that it was not done or attempted as an incident to equalization.

I cannot agree that the case of *Appeal of McNeal,* 35 Okl. 17, 128 Pac. 285, entirely sustains the contention of the relators. In addition to its having been rendered by a divided court of three to two, an examination of the constitution and statutes of Oklahoma will disclose that their state board of equalization is authorized to increase or decrease the value of different classes of real and personal property in order to make their valuation conform to the fair cash value thereof. They also provide for an appeal by any taxpayer from such increase. This appeal is provided for in their 1910 session laws and is recognized in this opinion, wherein, after quoting from an opinion in a former case, it is said:

"The limits expressed therein are the limits fixed by the constitution. Every taxpayer is entitled to have his property assessed equally and uniformly with the property of every other taxpayer. If his property is taxed at its fair cash value estimated at the price it would bring at a fair voluntary sale, and the property of all other taxpayers is so assessed, then the uniformity sought by law has been attained; but if this property is assessed at less than this, and the balance of the property conforms thereto, then an injustice has been done the balance of the taxpayers and the state. This limit upon the

assessment is the one provided for in the constitution, and is also the limit of the levy which may be assessed. * * * Beyond the limit of fair cash value, and the limit as to the rate of levy, the taxing authorities of the state cannot go; and wherever they seek to do so the law has provided every taxpayer a remedy by appeal, as provided in chapter 87, p. 173, session laws 1910.''

It is also worthy of notice that in the Oklahoma case no point was made that the equalization by the state board resulted in raising the property in the county affected above its actual cash value. On this subject the opinion states: ''It is worthy of note that no point is made that the equalization of which complaint is here made has resulted in raising the property above its fair cash value.'' The answer of the respondent alleges that the property of his county had been assessed at its full cash value and that this order, if followed, would place it forty per cent above that amount. According to our rules of pleading all material parts of this answer for the purposes of this case stand admitted as true. In such case were we to follow the Oklahoma decision we find that they have provided a method for appeal, so that the question of the increase or reassessment might be determined by a court of competent jurisdiction where all parties can be heard, and their statute provides that pending such an appeal the party shall not be required to pay taxes upon the property in regard to the assessment of which the appeal is taken. Our statutes provide a method whereby the tax commission are authorized, if they find any particular property to be assessed too low, to have a reappraisement upon notice to the owner, etc. Whether that portion of this act is constitutional or not is not before us. It is admitted it was not attempted to be followed.

Another reason why the action of the state board

should not be accepted as an effort at equalization between the different counties is because the order to raise pertains only to that portion of the property which has been assessed by the county assessors, but does not apply to the property assessed by the tax commission. The constitutional provision pertaining to the duties of the board authorizes them to adjust and equalize the valuation of real and personal property among the several counties of the state. This court has heretofore held that they could not equalize by ordering an increase in particular classes of property in a county.—*People v. Ames,* 27 Colo. 126, 60 Pac. 346. Yet this is the result of this decision for it allows the board to increase the value of all classes of property in a county except public utilities. 'Tis true, if they were included, take railroads for instance, accepting the legal presumption that the tax commission has performed its duty in assessing them, the result would be to fix their value at $140 for each $100 of actual value in the county of the respondent, $163 for each $100 of actual value in Weld county and $236 for each $100 of actual value in Costilla county, and so on. The injustice of such a position is apparent, but this is the identical result which follows the present order concerning the moneys of all taxpayers (other than that owned by public utility corporations) in the counties referred to as well as certain mining properties and others. When the state board formerly assessed the railroads they could fix their value in harmony with what they thought was the average for all the counties as returned by the county assessors, and when they made their equalization between the different counties, it was an effort at fixing valuations somewhere near equal upon all classes of property, but since the power to assess the railroads has been taken away from the state board and vested in the tax commission with the additional authority given them to assess other public utility property,

when we recognize the legal presumption that not only the commission but that the county assessors, who are constitutional officers, have complied with the law, I fail to find any authority which grants to the state board the right under the guise of equalizing between counties to simply order a raise as to certain classes of property in a county, namely, that of individuals, without making it apply to all property, and to allow them to do this as disclosed by this record would be to reverse the opinion rendered in *People v. Ames, supra,* as well as to, by judicial construction, read something into the constitution which is not there.

It has been intimated that in making this increase to the total valuation of his county the respondent is not required to add the forty per cent to all the property assessed by him, but can place it where he thinks it belongs the same as when making an original assessment. That a person's property cannot be reassessed or revalued for the purposes of taxation without notice to him, I take it will not be questioned.—*Gale v. Statler,* 47 Colo. 72, 105 Pac. 858; *Turpin v. Lemon,* 187 U. S. 51, 23 Sup. Ct. 20, 47 L. Ed. 70; 1 Cooley on Taxation (3d Ed.), 626; *Hagar v. Reclamation District,* 111 U. S. 701, 4 Sup. Ct. 663, 28 L. Ed. 569; *Davidson v. New Orleans,* 96 U. S. 97, 24 L. Ed. 616; *Bellingham Co. v. New Whatcom,* 172 U. S. 314, 19 Sup. Ct. 205, 43 L. Ed. 460.

That we have no statute providing for any subsequent notice or hearing cannot be disputed, but to the contrary not only do these orders instruct the assessor to add this forty per cent to all the property assessed by him, but section 33, page 623, session laws 1911, provides that when an increase is ordered as an incident to equalization it shall be made in this identical manner. In addition the respondent has alleged (which stands undisputed) that this is the only thing he can do, and as stated

there is no statutory method provided for his doing otherwise; there is no provision made for notice or hearing before him, or the county board of equalization by the taxpayers as to the effect of the result for the reason that prior to the receipt of these orders the time for all such has long since past.

In *Hacker v. Howe*, 72 Neb. 385, 101 N. W. 255, it is assumed that this is the correct method to follow where the increase has been ordered as an incident to equalization. The majority opinion, as I read it, holds that this is the only method to be followed; this precludes any assumption that it is to be done otherwise.

Had the legislature intended to give to the tax commission the power to reassess the property in a county other than public utilities, I think they would have thus stated. I fail to find anything in the acts of 1911 or 1913, which is susceptible of such a construction. The fact that section 13 of chapter 216, laws of 1911 gives to the tax commission supervisory power over the administration and enforcement of laws pertaining to the assessment, levying and collection of taxes, certainly cannot be construed to mean that it gives them the right to usurp the functions of a county assessor in the assessment of property, and in my opinion it has no bearing upon that question. Just as well contend that because the governor is the chief executive officer of the state, and by the constitution is charged with the duty of seeing that the laws are faithfully executed, that he would have the right to reassess the property in a county, or to re-perform the duty of any county officer, when he is of opinion that such officer is not complying with the law. That this section has no application is further borne out by the fact that it gives to the commission the right to require the county assessor to assess at the full cash value under penalty

of forfeiture and removal from office. This is one method provided to reach this result.

Subdivision 6 of this section provides that whenever, in the judgment of the tax commission, property in any county or municipal subdivision thereof has not been assessed at its true and full cash value, the commission may make a reappraisement to the end that all classes of property in such district shall be assessed in compliance with law, and when ordered it shall appoint an appraiser and assistant appraisers, if necessary, who shall proceed to appraise the property in such taxing district, and who shall have all the powers and perform all duties pertaining to the appraisement of property. The seventh subdivision provides that the commission may raise or lower the assessed value of any real or personal property thus reappraised, first giving notice to the owner, and fixing a time and place for hearing any person or persons interested, and that said hearing shall be held within the county in which said property is situate. By these two subdivisions another method is provided to reach the question of full cash value. That the inclusion of one or more methods is the exclusion of others unless there is positive language to the contrary, has been recognized from time immemorial as an elementary rule of statutory construction, as said in Pomeroy's Municipal Law (2nd Ed.), p. 542:

"The express mention of one thing implies an exclusion of another. This is one of the fundamental rules of interpretation, and is applied especially to statutes, so as to prevent the extension of their commands or prohibitions to other things of the same class, when an enumeration of the subjects within their provisions is expressly made."

To the same effect in principle are: *In re Constitutional Convention,* 14 R. I. 649; *State v. Hastings,* 10 Wis.

525; Cooley's Constitutional Limitations, p. 99; *Western Union v. Railroad Commission,* 120 La. 758, 45 South. 598; *Page v. Allen,* 58 Pa. 338, 98 Am. Dec. 272; *Denver v. Hyatt,* 28 Colo. 145, 63 Pac. 403; *Territory v. Ortiz,* 1 N. M. 12; *Westbrook v. Wicks,* 36 Iowa, 383; *Morris v. Wrightson,* 56 N. J. Law, 201, 28 Atl. 56, 22 L. R. A. 548; *State v. Henry,* 87 Miss. 125, 40 South. 152, 5 L. R. A. (N. S.) 340; 1 Kent's Com. (5th Ed.) 467.

The majority opinion concedes that the commission did not act or pretend to act under the provisions of subdivisions 6 and 7, *supra;* that the other portions of this section containing their supervisory power, rights and duties are not susceptible to a construction which gives them this power is apparent.

In *State v. Drexel,* 75 Neb. 751, 107 N. W. 110, the court had under consideration an act which provides that the state board shall have general direction and control of the county assessors in the performance of their duties and shall direct the same, also that the county assessors should obey all rules and regulations made under the act and the instructions sent out by the state board. It was held that these provisions did not give the board the power to control the judgment of the assessors concerning the values of properties, for the reason among others, that if the rule were otherwise and the board by this method could direct the county assessors as to what values they should put upon property, it would thereby accomplish indirectly what it could not do directly, namely, that of reassessing, which they were not authorized to do.

I agree with the majority that the manifest purpose of chapter 216, laws 1911, creating the tax commission was to place in a central body authority to aid in bringing about and maintaining a standard of values for the purposes of taxation, but it is elementary that in so doing

they must proceed in the manner provided by statute; I cannot agree that a method was prescribed in section 31 giving them the right to reassess the property of a county upon the lump sum basis by adding a per cent to the value fixed by the assessor, or at all. Neither can I agree that the method provided by subdivisions six and seven of section 13 (if constitutional) attempts to take from the county board any statutory rights pertaining to equalization. As I read these subdivisions they substitute a reappraisement by commissioners appointed by the tax commission, in lieu of the work of the county assessor, leaving the equalization to be made by the county board as theretofore. By other portions of the act, as an aid to carry out their supervisory power in seeing that the tax laws are enforced, they are given the right to prepare forms, to issue orders to the different taxing officers as will best carry into effect the provisions of law concerning taxation. It is provided that such officers, generally speaking, shall follow their instructions and shall be subject to penalty for violating them, they are given authority to prescribe a uniform system of procedure, to fix the form for tax schedules, rolls, warrants, notices and forms furnished to taxpayers, to call for reports from state, county and local officers, and to investigate the work of assessors, boards of county commissioners, equalization and county treasurers concerning the question of taxation, etc. For these purposes it is provided that one or more of their members shall visit at least half the counties of the state annually, and each county at least once in two years; they are authorized to summons assessors to appear before them to be examined under oath, to annually hold a meeting of the county assessors; to call groups of two or more together to appear in courts concerning questions of taxation; to pass upon the remission of taxes; to hear certain classes of complaints when made concerning taxation matters; to in-

spect books and make investigations; to require the production of documents, and many other duties, but none of which includes the reassessment of property save and except subdivisions six and seven of section 13 under which it is admitted they did not proceed. The act having thus prescribed their powers and duties in detail which do not contain any provision for reassessment except as provided in subdivisions six and seven the rule of construction which I have heretofore referred to is unquestionably applicable.

The fact that the tax commission were given the powers and duties referred to, which, if performed will of necessity cause the gathering of general information pertaining to taxation matters, and the relative values of the different counties, is convincing to my mind when considered in connection with the language used that their duties as prescribed in sections 31 and 32 of the act of 1911 were for the express and only purpose of advising the state board of equalization of what, in their opinion, were the relative values of the different counties, and how much each was above or below its full cash value, and to relieve that board, which is composed of the executive officers of the state, of at least a portion of such detail work in gathering data, etc., in order to ascertain the relative values for the purpose of performing their constitutional duty of equalizing.

The mere statement that a statute. means so and so proves nothing; persuasive reasoning is best presented by a consideration of the language used. Section 31 reads:

"Section 31. Duty of the Commission. The commission shall, on or before the first day of October following, determine whether the real and personal property of the several counties in the state shall have been assessed at its true and full cash value, and if, in the opin-

ion of the said commission the real or personal property within any county in the state as reported by said county assessor to the said commission is not on the assessment roll at its true and full cash value, the said commission shall determine the increase or decrease in the valuation in such county by such rate per cent, or such amount as will place said property on the assessment roll at its true and full cash value.''

Do we find in this section any language which says or can be construed to mean that the commission shall reassess the property, and if so when such an effort shall be attempted, or any date or dates when they shall sit for that purpose, or when they shall hear any county citizens, collectively or otherwise, concerning such questions? Is there anything to be found which says that the commission shall directly, indirectly or otherwise change, alter or amend, or order to be changed, altered or amended the abstract of assessment transmitted to them by the county assessor? I think not. It provides that they shall make a finding as to the relative values of the different counties, the benefit of such must be for the board which has power to equalize, but the commission is not possessed with that power. As I view it the reason why it makes no provision for hearings, fixes no dates for anything other than when it shall finish this work, and makes no provisions for orders to the assessor or for changes in his schedule, etc., is because it was never intended that their findings should bind any one, or be other than a recommendation in the way of a report to the state board of equalization. This position is borne out by what follows and what becomes of this finding. Section 32 following reads:

. ''Section 32. Statement to the State Board of Equalization. When the commission has determined the true value of the real and personal property in the several

counties, the commission shall transmit to the state board of equalization a statement of the amount to be added to or deducted from the valuation of the real and personal property of each county, specifying the amount to be added to or to be deducted from the valuation of the real or personal property.''

The substance of this section is that they shall send to the state board of equalization a statement concerning the result of their findings, what then happens? Section 33 following reads:

''Section 33.    Duty of State Board of Equalization. It shall be the duty of the state board of equalization to examine the abstracts of assessment as submitted by the state tax commission and the state board of equalization shall forthwith examine the abstract of assessment of each county as submitted by the state tax commission and make a record of its action on the abstract of each county and certify the same to the county assessor, and the county assessor shall forthwith add to or deduct from each tract or lot, and its improvements, of real property and all personal property in his county the required per cent, or amount on the valuation thereof as it stands after it has been equalized by the state board of equalization, adding or deducting in each case any sum less than five dollars so that the value of any separate tract or lot and its improvements shall be ten dollars or some multiple thereof.''

Do we find anything in this section which says or can be construed to mean (if it could be authorized) that the state board should accept the findings of the tax commission, or that they should make this increase to the abstract of the county assessor or order the assessor or the tax commission to do so? Not at all. But to the contrary, it says that they shall forthwith examine the abstracts of assessment of each county, as submitted by

the tax commission, and make a record of its action on the abstract of each county and certify the same to the county assessor, etc.  It will thus be observed that the only object in having the commission gather this data and make these findings is for the information of the state board of equalization in the performance of its constitutional duty.

The fact that all its statutory duties have been taken away and transferred to the tax commission can in no wise change the result, and does not change the language in these sections, neither can it strip the state board of any of the powers and duties imposed upon it by the constitution.  It will be observed that section 33 does not say what the state board shall do with these abstracts other than examine them, make a record of its action, and certify the same to the assessors.  The reason is apparent and that is that their action thereon is the constitutional duty to adjust and equalize; it is for that purpose they are sent to them; that they are to be thus sent is not changed by the act which takes from them their statutory duties, and vests it in the tax commission.  The most that can be contended for section 33 in this respect would be that the tax commission should certify to the different county assessors the result of the action of the state board of equalization and this is just what the commission did.

Whether the construction given to section 31 of the act of 1911 by the majority would make it unconstitutional, in my opinion, is unnecessary to consider, as I cannot conceive that it is susceptible to such a construction.  The reasoning presented to support it is about as convincing to me as the assertion would be that the word "no" means "yes."  By the holding of the majority as I understand it a county can be re-valued and re-assessed for all taxation purposes by the method pre-

scribed in subdivision 6, *supra,* or under section 31, eliminating the constitutional question of notice and opportunity to be heard under the latter section, the conclusion must follow that the county assessor, although a constitutional officer, could by the same process of reasoning be supplanted in all matters pertaining to local assessments; if not where is the line to be drawn? It appears to me that this position is in conflict with former declarations of this court. In *Taxation of Mining claims,* 9 Colo. at page 636, 21 Pac. 476, it is said:

"Before taxes can be levied upon any article of property, it must be assessed, that is to say, valued for taxation. This, in general, is the province of officers whose title of office indicates their duties, to-wit, assessors. The constitution has created this office, and requires that an assessor shall be elected biennially in every county of the state."

While in a later case, that of *Ames v. The People,* 26 Colo. 83, it was said that this language was not necessary to the decision; it was not stated that it was unsound when applied to local property situate in the county, such as mining claims which were the subject for assessment under consideration in the former case.

The latest case by this court upon this subject is *In re Questions of the Governor,* 55 Colo. 17, 123 Pac. 660, wherein we sustained the constitutionality of that portion of the act creating the tax commission, but we expressly called attention to the fact that we could not approve a construction of any portion which would contravene the constitutional authority of county assessors. That portion of the opinion reads:

"If provisions of the act can properly be construed as permitting the tax commission to do things in the matter of local assessments which would contravene the

constitutional authority of county assessors, such provisions are necessarily non-effective."

As it looks to me this is the result of the conclusion of the majority and is in effect an overruling of this declaration, for if by this method the property in a county can be locally re-assessed and re-valued for the purposes of taxation for city and county purposes, as well as state, as here held, then the office of county assessor becomes one in name only, and it would be a useless expenditure of public moneys for any assessor to go through the form, as it will be only a form, of assessing property, and it will be a useless expenditure of time and money for county commissioners to sit as a board of equalization, for all their efforts will avail nothing, if without investigation and without the adoption of any method the valuation of property can be admittedly fixed at grossly inadequate sums or at a sum largely in excess of its true cash value.

I cannot agree with the correctness of the statement "that it is not conceded that the property assessed as valued by the county assessor is at its full cash value."

In his answer the respondent alleges certain facts, the substance of which are that the property in his county, assessed by him, was assessed at its full cash value; that the tax commission in making its estimate did not make an investigation and did not visit the several counties of the state, as by law they are required to do, and did not pursue a uniform method or test for the purpose of ascertaining whether in truth and in fact the value of real and personal property had been assessed at its full cash value, but that they arbitrarily, and without ascertaining the truth as to whether the respondent assessed the property in his county at its true cash value, proceeded to determine that he had not made a full and true cash value thereof, and that they, in an arbitrary

way. and without warrant, in fact, declared and determined that they would increase the valuation of said real and personal property in his county to the extent of $101,902,088, making the rate of increase forty per cent in excess of its full and true cash value. He further alleges that their action in this respect was fraudulent in so far as it affects the owners of real and personal property in his county. The relators have demurred to this answer, for which reason all material parts for the purposes of the case stand admitted as true, and I cannot concede that the performance of the duties of the tax commission in the manner provided by statute is immaterial, or that the allegations concerning the real value of the property in the county of the respondent is to be ignored, when by the opinion as I understand it, the taxpayer is to be precluded hereafter from raising it anywhere.

Neither can I agree to the statement by the majority that "It is conclusively presumed, however, that as between individual property owners within the county there has been a just value placed thereon, that is a value relatively equal," unless it is likewise to be conclusively presumed that all property in the county has been assessed at its full cash value. As I view it under the law the one presumption is entitled to as much weight as the other; there are many reasons why it should be so. Take for instance the value to be placed upon producing mines, the assessor has no discretion in fixing their value. The act of 1913 provides that for the purposes of taxation the assessor shall value them at a sum equal to one-half of the gross proceeds, plus all of the net proceeds, and it provides a method whereby these proceeds are to be accurately ascertained. The provisions of this act are mandatory, and the assessor has no right to do other than follow its mandates. The county board of equalization as held by the majority, would likewise have no authority to change the valuations thus fixed in the manner

provided by statute; other illustrations could be given. The presumption must of necessity follow that all other property in the county has been likewise assessed or equalized to this value; so that when it comes to legal presumptions the one is equally entitled to as much weight as the other.

The majority misconstrue respondent's position pertaining to the reason of the legislature in submitting the proposed amendment to section 15 of article X of the constitution, which the people rejected at the 1912 election. It is not claimed that it was done because the legislature was of the opinion that the act passed by them was unconstitutional, and that they thereby sought to correct it by submitting a constitutional amendment, but to the contrary, it was submitted at the same session (1911) when the act creating the tax commission was adopted, and was thereby a legislative construction, not that they thought any portion of the act was unconstitutional, but because they construed their own act to mean they had not given to the tax commission any authority to assess, value, reassess or revalue counties as a whole by per cent or otherwise, except as provided in subdivisions six and seven of section 13, *supra.* Had they intended giving to the tax commission this power in the act creating it which we agree they must assume was constitutional, why would they have inserted the identical powers in a constitutional amendment submitted at the same session? I do not care to charge the legislature with the doing of useless and unnecessary things; to my mind the submission of the constitutional amendment is a legislative declaration that they did not construe their own act to include this power. But regardless of this legislative construction, and in disregard of the fact that the people have declined to grant to this commission this power even by constitutional amendment a majority of this court now say that nevertheless they have the right to exercise it.

Another reason why the legislature never intended that the tax commission should have the right to raise the total by counties as ascertained by the county assessors is its enactment at its last session of the so-called limitation levy act, wherein it is sought by limiting the amount of the levy in each county to compel the assessor, in order to get sufficient revenue for county purposes, to assess all property therein at its actual cash value. If it was intended as contended that the commission has the right to increase the aggregate, then it is pertinent to ask why the necessity of any limitation of the levy for county purposes. Why not allow the commission to fix the value of each county, regardless of the value fixed by the taxpayers and the county assessors? The question to my mind answers itself and is self-evident that the legislators never intended by any act of theirs to grant this power.

The theory that a tax commission can re-assess or revalue a county as a whole, upon a per cent basis, or in a lump sum for the purposes of taxation for all local taxes as here held, as before stated is not claimed in the briefs, and no authorities have been cited which refer to such a statute. The cases cited pertain to equalization boards, or to reassessments of particular properties where notice is given, etc.

In *State ex rel. Hessey v. Daniels,* 143 Wis., 649, 128 N. W. 565, the opinion in addition to being rendered by a divided court has no application. The result of that decision was to sustain the validity of chapter 259, Wisconsin laws 1905, which provides that upon complaint made after notice, hearing, etc., it is made to appear, etc., that the assessment in any district is not in compliance with law, etc., the commission may order a reassessment and a new equalization and for that purpose shall name persons to make the reassessment and others the equal-

ization.  The act provides that the parties thus named shall take the oath, etc., give all the notices and go through all the formalities required by the assessor and board of equalization whose work they are to do over. It provides that any owner of taxable property in such district shall have the right to examine such reassessment, and shall have all the rights and privileges in respect to such reassessment that are given by law in respect to any original assessment.  It will thus be observed that the right to be heard before all tribunals passing upon the value of his property, is, by the Wisconsin statute, given to the taxpayer the same as in the first instance.  This would have been the result here had the commission acted under the sixth subdivision of section 13, *supra,* but it is admitted that they did not attempt to do so, but to the contrary the pleadings disclose that they in fact made a re-assessment without investigation, and without any effort at ascertaining the value of the property to be thus assessed, leaving it to pure guesswork.

The case of *Wisconsin ex rel. Brown County v. Myers, Judge,* 52 Wis. 628, 9 N. W. 777, was upon the same theory as the later case in the 143 Wisconsin.  The difference being that the contention in the earlier case was limited to the appointment of commissioners to review the aggregate equalization made by the county board, in order, as the opinion states, to produce a just relation between all the valuations of the taxable property of the county.  By the earlier statute this commission was appointed by the circuit judge.  The reasoning is similar to that in the latter case concerning the question of review, and, while not having the time to investigate the earlier statute, it is fair to assume that the constitutional rights of the taxpayer concerning notice, hearing, etc., were fully protected.  The opinion further discloses that the appointed board was without authority to in-

crease the entire aggregate valuation of the taxable property of the county as previously fixed, so that when it comes to equalization its conclusions are in harmony with the announcement of this court thirty-six years ago; it has no application to the facts here.

The case of *Board of State Tax Commissioners v. Board of Assessors,* 124 Mich. 491, 83 N. W. 209, sustains the validity of the Michigan act of 1899 creating a board of state tax commissioners and giving them supervisory authority in the matter of the assessment of property. It has no application to the views of the majority, but to the contrary it is in harmony with our views in *In re Opinion of Justices,* 123 Pac. (Colo.) 669, which opinion, as I take it, is in part overruled by the conclusion reached by the majority.

The case of *Spalding v. Hill,* 86 Ky. 656, 7 S. W. 27, sustains the validity of the Kentucky act creating the state board of equalization with the right to equalize as between counties and nothing more. I am unable to appreciate its application to the facts here. The substance of the opinion in *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co. v. Backus, Treasurer,* 133 Ind. 513, 33 N. E. 427, 18 L. R. A. 729, is to sustain the validity of an act authorizing the state board of tax commissioners to assess railroad property. This is in harmony with the views of this court.

In *State v. Thomas,* 16 Utah 86, 50 Pac. 615, the opinion discloses that the constitution and statutes of Utah are different from ours. Under theirs the state board of equalization has the right to change the value of certain classes of property allowing other classes to remain unchanged. In that case the attempted effort to raise all classes was declared invalid. The question of lack of notice to the individual taxpayer as a denial of the equal protection of the law, or as taking property

without due process of law, was not gone into. I gather this from the concluding statement in the opinion which reads: ''The order cannot be upheld as a proper exercise of authority, and is therefore void. Having reached this conclusion, it is unnecessary to discuss any other question presented in this case.'' While it is true under their constitution and statute it was held that as an incident to equalization the state board had power, if necessary, either to raise or lower the total valuation of the property of any county fixed by the county assessor, even though it might by such action raise or lower the aggregate valuation of all counties of the state, it was expressly held that it was beyond the power of the board to raise the value of money in any county for the reason, as stated in the opinion, which, when referring to this order calling for the general raise of all property in the county, says:

''It was also defective because it included money in its operation. It clearly cannot be held operative as to money, for, as appears from the record, each dollar of the relators, on the assessment roll, is valued at a dollar; and, when money is so valued, no board or officer can add 5 per centum or any per centum to it. This is so under the constitution, which makes money the standard of valuation for all taxable property. The value of all property, however, cannot be determined in the same way. Because of its dissimilarity, the process by which the judgment is formed must vary, and probably as to all property, except money, perfect equality in valuations and assessments is unattainable, owing to the fallibility of the human judgment. The value of a dollar may be determined by ascertaining that it is what it purports to be.—*Porter v. Railroad Co.*, 76 Ill. 594.

''The legal value of a dollar in money is a dollar, and therefore to value and assess it at more than a dollar

cannot be a valuation and assessment, 'according to its value in money.' This being so, the court will take notice, as matter of law, that money cannot be assessed for more than its legal value. Hence, from the nature of things, the state board cannot change the valuation of money on the assessment roll already assessed at its legal value, and thereby make it cease to conform to the mandate of the constitution.''

By the use of this language it is evident that the Utah court means that their state board cannot order all property in a county to be raised a certain per cent when such an order would mean to raise some above its true cash value.

Applying the declarations in the Utah case to the facts here, coupled with the legal presumption which must prevail that the method provided for fixing the value of mines, money, etc., was adhered to, what is the result when tested by section 3 of article XX of our constitution pertaining to the uniformity of taxation? To do this it should be borne in mind that by authority of chapter 133, Session Laws 1913, the tax commission assesses and fixes the value upon the property of all public utility corporations in any county. They are not assessed by the county assessors, and this increase of forty per cent applies only to the property assessed by respondent, and not to the public utility property, which we will assume has been assessed at its fair cash value.

To illustrate, take the person who has $100 in money and who makes a sworn statement of that amount and of the value of $100; money has only one value and is the standard of values. The respondent assessor, as provided by law, has under his oath assessed it at the value of $100, but by this order he is compelled to raise its value to $140, and this without opportunity to the owner to be heard before the body which has ultimately fixed the

value of his $100 at $140. If in Weld county for his $100 the owner would pay taxes on $163, if in Costilla county on $236, and in fact a different value would by this method be fixed for $100 in money in nearly every county in the state. While on the other hand the public utility corporation returns its sworn statement of moneys to the tax commission which fixes the value of its $100 at $100, and has it thus assessed properly so. The corporation has had the additional advantage of being heard before the body which makes the assessment. We thus have the corporation's $100 assessed at the value of $100 by the state tax commission, with full right to be heard before that body, while the value of the private citizen's $100 is fixed at a value of $140 if in Denver, $163 if in Weld, or at $236 if in Costilla county, and so on without any right, before, at or after it is thus fixed, to be heard before the tribunal which has thus fixed its value.

Unless we are to ignore our rules of pleading and the legal presumption to which every officer is entitled, that he has performed his duty, and assume that about all of our assessors are open violators of the law, and that the great mass of people in Denver who have subscribed to their returns are criminals, this raise means that the individual taxpayer's property in Denver will be valued for taxation purposes at forty per cent higher than that of the public utility. To better illustrate, it means that every little home in this city of the value of $1,000, and which has been assessed at that amount by the assessor, and which by the pleadings is conceded to be only of that value, must pay taxes upon an arbitrary valuation as fixed by this order at $1,400. A citizen with property of the value of $100,000 must pay upon a valuation of $140,-000, and so on. When applied to the statute which provides the method for ascertaining the value of producing mines it means that the results ascertained thereunder are to be disregarded, and the values as thus fixed by law

are to be changed out of proportion to their actual cash value to the same extent as the illustrations heretofore given concerning money will disclose.    To better illustrate, say for the purposes of taxation that the value of a mine in Costilla county has been fixed at $10,000 by the statutory method concerning which the assessor has no discretion, yet by this order of the tax commission it is raised to $23,600 with no possible method of relief pointed out by the majority to the owner.

The constitution of the United States provides that no state shall deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws. Our constitution provides that no person shall be deprived of life, liberty or property without due process of law.    In my opinion it is very questionable if the action of the state board in this respect does not violate these provisions.

In *Londoner v. Denver*, 210 U. S. 386, 52 L. Ed. 1103, 28 Sup. Ct. 714, it was said:

"It must be remembered that the law of Colorado denies the land owner the right to object in the courts to the assessment, upon the ground that the objections are cognizable only by the board of equalization.

"If it is enough that, under such circumstances, an opportunity is given to submit in writing all objections to and complaints of the tax to the board, then there was a hearing afforded in the case at bar.    But we think that something more than that, even in proceedings for taxation, is required by due process of law.    Many requirements essential in strictly judicial proceedings may be dispensed with in proceedings of this nature.    But even here a hearing, in its very essence, demands that he who is entitled to it shall have the right to support his allega-

tions by argument, however brief; and, if need be, by proof, however informal.''

While this opinion refers to a special assessment yet, if I understand our present statutes correctly, they attempt to provide a complete system for the assessment of property for taxation, including the fixing of its value by special tribunals provided for that purpose, namely, the county assessor, county board of equalization as to certain property, the tax commission, and the state board of equalization.  Certain times and places have been provided whereby certain taxpayers can present their grievances to certain of these tribunals concerning the valuation of their property; in certain instances appeals are provided to the court, but in order to secure them certain steps must be taken at certain times, and in case the taxpayer neglects to do so he is denied the right to object in the courts for the reason that the objections must in the first instance be considered by the special tribunals, and their ruling except in case of appeals provided by statute are intended to be final. As I read it the majority opinion sustains these conclusions, but by holding that section 31 of the act of 1911 gives to the tax commission the right to re-assess the property in the county theretofore assessed by the county assessor, it leaves the taxpayer, whose property is thus re-assessed and raised, without any right to be heard before the tribunal which the majority holds has the right to make the increase. Neither is there any provision for subsequent hearing before the county assessor or county board, pertaining to such increase; the times provided by statute for hearings before them or their right to act has gone by.  That such a hearing may be given before any of these bodies as a matter of favor instead of being provided by statute as a matter of right, is not sufficient.—*Security Trust Co. v. Lexington*, 203 U. S. 323, 27 Sup. Ct. 87, 51 L. Ed. 204; *Stuart v. Palmer*, 74 N. Y. 183, 30 Am. Rep. 289; *Weyer-*

*haueser v. Minnesota,* 176 U. S. 550, 20 Sup. Ct. 485, 44 L. Ed. 583; *Kentucky Tax Cases,* 115 U. S. 344, 6 Sup. Ct. 57, 29 L. Ed. 414; *Cook v. Lasher,* 73 Fed. 701, 19 C. C. A. 654; *Spencer v. Merchant,* 125 U. S. 356, 8 Sup. Ct. 921, 31 L. Ed. 763.

I cannot agree that the principles applicable to the state board of equalization apply with like force to the tax commission when attempting to make a reassessment of property. Assuming *arguendo* that section 31, *supra,* empowers the commission to add to or deduct from the valuation of all the property in the various counties there is nothing in the section which provides for hearing, notice, etc., or certain times fixed for so doing; no dates are fixed for anything other than when they shall finish their labors, other times are uncertain and indefinite. If an assessor makes his return before the first Monday in September, which he is permitted to do, the commission could commence to work on it at any time. I fail to find anything in any portion of this act which can be construed to mean as fixing any time or place for hearing upon this question by the individual taxpayer, or by a county's representatives. The reason, in my opinion, is apparent, namely, that the information thus gathered and findings made are advisory only to the state board and the holding otherwise, probably, presents a case of the taking of property without due process of law. I cannot agree that section 15 of the act has any application to matters to be acted upon by authority of section 31. Its language indicates to the contrary; it reads:

"Section 15. Complaints. The commission may receive complaints and carefully examine into all cases where it is alleged that property subject to taxation has not been assessed or has been fraudulently or for any reason improperly or unfairly assessed, or the law in any manner evaded or violated, and may cause to be insti-

tuted such proceedings as will remedy improper or negligent administration of the taxation laws of the state.''

It is self-evident that nothing in this section can be construed as pertaining to any hearing concerning any reassessment of the entire property of the county by the tax commission; but to the contrary it means as it says, that upon complaint which alleges that the property subject to taxation has not been assessed, or has been fraudulently, or for any reason improperly or unfairly assessed, or the law evaded or violated, they may cause to be instituted such proceedings as will remedy, etc., some of which proceedings have heretofore been pointed out. It is not claimed that in making their findings under section 31 the commission acted upon the complaint of anyone. Subdivisions 6 and 7 of section 13 contain provisions for notice to the taxpayer, and provide for a hearing when the value of his property is to be raised, hence, it is proper to assume that had the legislature intended that the value of his property separately or in conjunction with the entire property in the county could be revalued and the value increased by the commission under the provisions of section 31, it would have provided some method for notice to him or the officials of his county, or have fixed some particular time for so doing and for the hearing of complaints.

As I view it the taxpayer, the value of whose property has been raised by this reassessment, or his county's representative, is not given an opportunity to be heard before the body which has made the raise, to-wit, the tax commission. Two other members of the court concur in this conclusion, four to the contrary. In case No. 8208, *The State Board of Equalization v. The Bi-Metallic Investment Company et al.,* which is a suit brought by a taxpayer to enjoin the respondent from extending this increase upon its property, and which case was argued with

this, the district judge was of the opinion that such a hearing had not been provided, and that to allow the increase to be added would be the taking of property without due process of law, so that thus far the official expressions by the judiciary of this state upon this question stand equally divided. 'Tis true, the trial judge who rendered this decision is not a member of this court, but an examination of the session laws will disclose that for a long time he has been upon the district bench and was one of its judges as early as 1889, and while his conclusion has not the same effect as that of a member of this court, his long period of service and record is such as to entitle his opinion to great respect, and if this point could be disposed of by the reasoning in former opinions of this court, I am confident that they sustain the conclusion that such a hearing has not been provided in the method followed.

To go into the question of due process of law, etc., in detail would be to unnecessarily extend this opinion. The question was not involved in the Oklahoma case because their statute gives to the taxpayer this protection. The Utah court found it unnecessary to consider it upon account of their decision being against the state board for other reasons. The Nebraska court, without going into the fact in detail, intimates that the taxpayer whose money has been assessed at more than its actual cash value might be entitled to a hearing and secure relief in a court of equity, when and for any reason that would not be in conflict with their ruling in sustaining the validity of the action of their state board is not disclosed, but these cases and others cited are all on the question of equalization. No cases on re-assessment are cited wherein such a notice and hearing has not been provided. If I read history correctly, one of the main grievances of our forefathers was the fact that there was imposed upon them the burden of taxation without representation; per-

sonally I am unable to appreciate any difference between taxation without representation, and taxation without the right to be heard concerning the value of the property upon which the tax is to be imposed. In my opinion the inequity following the results is about as near equal in the one case as in the other. Upon this question of due process of law concerning taxation matters, I call attention to the following cases: *Central Ry. Co. v. Wright*, 207 U. S. 127, 28 Sup. Ct. 47, 52 L. Ed. 134, 12 Ann. Cas. 463; *Security Trust Co. v. Lexington*, 203 U. S. 323, 27 Sup. Ct. 87, 51 L. Ed. 204; *Hovey v. Elliott*, 167 U. S. 409, 17 Sup. Ct. 841, 42 L. Ed. 215; *Windsor v. McVeigh*, 93 U. S. 274, 23 L. Ed. 914; *Gale v. Statler*, 47 Colo. 72, 105 Pac. 858.

When the difference between the rights, duties and privileges of the corporation which owns the public utility and other taxpayers is considered, it is questionable whether the method which the majority approves is not a denial to the individual taxpayer of the equal protection of the law. It will be observed that he is given a hearing before the assessor or the county board of equalization concerning the value of his property, and as compared with that of certain other property assessed by the county assessor, but this does not apply to the public utility because his county board has no jurisdiction over that; he is not given any hearing before the tax commission concerning the valuation of his property as compared with the public utility, or as to the re-valuing of it for any purpose, while the corporation is given hearings before them concerning both these questions; besides, a hearing before this body under section 31 would do him no good, for as construed by the majority the section does not permit of their doing otherwise than re-assessing the property in his county upon the per cent basis as a whole. After the raise is ordered he is not entitled to any hearing before his county assessor or county board, for

the time for all hearings before them has gone by, and if they granted it they could afford him no relief. This, in substance, as I construe the opinion, means that the corporation can be heard before the body which makes its assessment, with the right to present evidence, data, etc., concerning the valuation of its public utility, and a comparison as to the relative value between it and other property, and that the commission, without investigation, can make a guess at or arbitrarily fix the valuation of the individual taxpayer's property, by re-assessing a county in lump under section 31, and without the right of a hearing upon his part or even by his county's representatives. In my opinion this presents a rather one-sided star-chamber system of procedure in favor of the corporation upon the question of taxation. As it looks to me it includes the trial and in this instance the conviction of the little fellow without his having an opportunity or right to be heard, or even to be present during the trial of his case, or at any time afterwards. Upon this question I call attention to *County of San Mateo v. R. R. Co.* (C. C.), 13 Fed. 722, cited by this court with approval in *U. P. Ry. Co. v. De Busk,* 12 Colo. 302, 20 Pac. 752, 3 L. R. A. 350, 13 Am. St. Rep. 221.

Unquestionably some property in Denver, as well as other counties, has been assessed too low, as has likewise unquestionably some public utility property, but these are no reasons why former decisions should be overruled or constitutional provisions ignored, and this at a time when a proposed amendment has been submitted to be voted upon at the next election, for the purpose of amending the constitution upon this subject. Were the question one which involved the state tax alone it would not be so serious in its results, but when we consider that the question of equalization between the corporate property defined as public utility, and the property of individuals applies as well to all county, city, school and other

taxes, the gravity of the situation is apparent. In the *Bi-Metallic Investment Company* case, *supra,* brought in the district court for the purpose of preventing the respondent from adding this increase, it was alleged that its property was not of the value of $802,000, which amount had been fixed by the respondent assessor; that the forty per cent increase ordered of $320,800 would make the total not less than $500,000 in excess of its real and full cash value.

Public records disclose that the tax levies in Denver for 1913 were made upon November 24th, and for state, county, city and ordinary school purposes (all of which apply equally throughout the city and county) were fixed at fifteen mills, when the company is held to have accepted the value fixed by the county assessor. This levy upon the increased value which it offered to prove its property was not worth, will amount to $4,812, and if my conclusion as to what the majority opinion means is correct, the company has no recourse elsewhere, and if the allegation of its complaint is true, which it offered to prove, it appears to me that this is a taking of this much of its property without due process of law. When we accept the legal presumption that this respondent and his county board have performed their duty in assessing the property at its full cash value (which fact they have offered to prove), considered with the pleadings by which this fact stands admitted as to all other property in his county assessed by the respondent, the result means that the individual taxpayers therein are to pay $1,528,531.32 in excess of their proportion of taxes for all purposes in the city and county of Denver for 1913, upon account of this inequality between the relative values of their properties and that of the public utility. The fact that upon account of this increase they may or can reduce the amount of their local levies as has been intimated (a question concerning which I express no opinion) will not

change conditions concerning the comparison of values referred to, as any reduction in the levies will apply equally upon all values in the county as fixed by this method, which includes this increase upon the property of the private citizen, but adds nothing to the public utility property of the corporation.

### On Petition for Rehearing.

Mr. Justice Gabbert delivered the following opinion:

By the majority opinion unrestrained power is now vested in the tax commission to increase the valuations of each county by horizontal raise above the valuations returned by the assessors. By this means the aggregate valuation of the local officials has been enormously increased. There does not seem to be any limit to the increase which the commission may make. They say that this increase only brings the property in the several counties up to its cash value, but they are the sole judges of what constitutes such value. The control which the people have heretofore exercised over valuations through their local officials, which has never been questioned since the decision in the *Lothrop* case in 1877, is swept away, and unlimited power to increase valuations vested in a central appointed body. It is only necessary to refer to one provision of our constitution to demonstrate that the general assembly can not confer upon the tax commission the power which the majority opinion says it may exercise. The constitution provides that the rate of taxation for state purposes shall never exceed four mills on the dollar. The object of this is to protect the people from being burdened with state taxes beyond a fixed limit; but with unrestrained power vested in a central body to increase the valuations returned by the county assessors all that is necessary for them to do in order to avoid and

set at naught the constitutional limit of the rate of taxation for state purposes is to make such increase. By the construction given the tax commission act the efforts of the people in their fundamental law to establish legitimate restraints on the power to tax are rendered unavailing, and the checks and guards they have embodied in the constitution to that end cease to be of any force or value.

In my opinion the general assembly can not confer upon a central body the power to assess the real and personal property in the several counties. It may confer supervisory power upon such body, but the majority opinion goes to the full extent of holding that the unqualified power of assessment is conferred upon the tax commission. It is also my opinion that the authority of the state board of equalization is limited to reducing to a uniform basis the valuations returned by the local officials. If these assumptions are correct then a great injustice results to the taxpayers in the 58 counties where the valuations have been increased. This increase amounts to nearly $187,000,000. The state tax which will be realized from this great increase must be paid by the owners of real and personal property in these counties, while the public utility corporations, which includes all corporations like railroads, water, street railways, gas, telephone and telegraph companies, and all utility corporations having a continuity of business in two or more counties, whose property is assessed by the tax commission escape paying any portion of the tax resulting from such increase. Had the board of equalization equalized the valuations returned by the local officials, without adding to their volume, then in order to raise the same revenue for state purposes which the present rate would bring in it would have been necessary to increase the percent of the rate, but in that event the utility corporations would have been required to pay their proportion of the

tax resulting from the increased rate which now the owners of real and personal property alone are required to pay.

A rehearing should be granted and judgment rendered quashing the writ and dismissing the proceedings.

By Mr. Justice Hill:

Since filing my dissenting opinion, advance sheet No. 1, vol. 137, Pacific Reporter, dated January 19th, has been received. Beginning at page 174 is reported the case of *Idaho Tax Commission v. Board of Commissioners of Bannock County,* wherein the supreme court of Idaho has held that by the language used in their act creating a tax commission and defining its duties, it was not intended to deprive any officer or board of the duties imposed upon them by the implied provisions of the constitution, or that the commission should usurp or perform the duties of the assessor or county board of equalization; that since their constitution provides a scheme or framework for the administration of their revenue laws the legislature cannot submit another or different scheme or method therefor; that to give the act this construction, as contended for by the commission, would make it unconstitutional; that since the constitution provides a method or system for the assessment of property with the object and purpose of arriving at a uniformity of valuation, and has designated certain officers to perform the duties relative thereto, it is beyond the power of the legislature to take from such officers such duties; that the words "assessor," and county "board of equalization," as used in their constitution, carry with them the powers usually conferred on officers or boards of like names. These conclusions are in harmony with the former declarations of this court.—*In re Taxation of Mines,* 9 Colo. 635, 21 Pac. 476, and *In re Questions of the Governor,* 55 Colo. 17, 123 Pac. 660.

The construction which I have contended should be given to section 31 of our act of 1911 relieves it of the constitutional objection pointed out by the Idaho court; while the construction given it by the majority makes it unconstitutional when tested by the reasoning in the Idaho case. As a further confirmation of the correctness of my former views sustained by the reasoning of the Idaho court, I call attention to the similarity of the provisions of their constitution and statutes and ours concerning the powers and duties of the assessor, the county and the state board of equalization.

Decided January 12th, A. D. 1914. Rehearing denied February 2d, A. D. 1914.